HALL DAVIS *v.* THE STATE.

1. MURDER — INDICTMENT. — If the accused be indicted as a principal offender, evidence that he did not inflict the fatal injury, but was present when it was done, and, knowing the unlawful intent of the person who did inflict it, aided him by acts or encouraged him by words, is competent and admissible against him. It is not necessary that the indictment should, in view of such proof, charge the acts done or the encouragement spoken.

2. EVIDENCE — VERBAL ACTS. — When the state puts in evidence against the accused an act done by him, material to be understood, his declarations at the time, expressive of the character, motive, or object of his act, are regarded as verbal acts, and are competent evidence for him as well as for the state. He cannot, however, himself introduce evidence of his own act, and then prove his declarations accompanying it.

3. SAME — CASE STATED. — W. and D. being jointly indicted, but separately tried, for murder, there being no eye-witness of the homicide, the state proved on the trial of D. that within an hour after its perpetration he was in possession of the horse of his co-defendant and the pistol of the deceased, and delivered them to the witness for the state. The accused proposed to prove by the witness any statement then made by the accused explanatory of his possession of the horse and pistol; but the court below, on objection by the state, excluded the proof. *Held*, error.

4. EVIDENCE. — Acts or declarations of the accused are not admissible evidence in his behalf unless they occurred within the period covered bv the criminating evidence, or tend to explain some fact or impair some evidence adduced against him.

5. SAME. — When part of a conversation is drawn out by one party, the other is entitled to have the whole of it go to the jury; but the jury may determine the truth of the whole or any part of it by its intrinsic credibility, or by the other evidence adduced in the case.

6. SEPARATION OF THE JURY does not, *per se*, vitiate the verdict, even in a capital case. It may be explained, and the verdict will not be disturbed unless it appears that the misconduct affected the fairness of the trial.

APPEAL from the District Court of Washington.   Tried below before the Hon. E. B. TURNER.

The opinion of the court discloses the leading features and the most material facts of this interesting and well-contested case.   Counsel for the appellant, and the associate counsel for the state, presented the case in printed arguments which, though necessarily elaborate, are models in style as well as in matter.   The official counsel for the state deemed it unnecessary to add anything to the argument of his associates.

*Sayles & Bassett* and *Breedlove & Ewing*, for the appellant.

*George McCormick*, Assistant Attorney General, and *Shepard & Garrett*, for the State.

ECTOR, P. J.  Hall Davis, the appellant, was jointly indicted with one John Ward for the murder of William

Mahlman, on May 23, 1877. There was a severance, and Davis was alone put on trial. He was convicted of manslaughter, and the penalty assessed at five years in the penitentiary. The indictment contains but a single count, charging that both the defendants, together and with each other, with a certain knife and pistol, that were deadly weapons, which they in their hands then and there held, did make a deadly assault, with malice aforethought, upon the said William Mahlman, then and there inflicting two mortal wounds upon said Mahlman, one in the neck, with the knife, and the other on the left shoulder-blade, from the pistol, from which wounds he then and there instantly died.

The indictment is attacked, for the first time, in this court. There was no motion made in the lower court to quash it, or in arrest of judgment. The objection now made to the indictment is not well taken. It has been frequently decided by our Supreme Court that it is not necessary to allege in the indictment the facts relied upon to show the defendant to be a principal, although the offense with which he is charged may not have been actually committed by him. But, if he is a principal offender by reason of the part performed by him in the commission of the offense, he may be convicted under an indictment charging him directly with its actual commission. If the pleader, instead of proceeding under a general indictment, prefers to do so under a special bill, charging each of the defendants with the particular acts done, or part performed by them respectively, should the facts alleged as to some of them be insufficient to show their guilt, the indictment as to them would be held bad. *Williams and Smith* v. *The State*, 42 Texas, 392; *Johnson* v. *The State*, 1 Texas Ct. App. 130.

The first error assigned by the appellant is as follows:

" 1. The court erred in the admission and exclusion of evidence over the defendant's exceptions, as shown by the bills of exceptions."

The evidence of the case covers nearly sixty pages in the transcript. The counsel on both sides have reflected credit upon themselves by the ability displayed in their oral arguments and briefs.

The testimony shows that Davis, Ward, and Mahlman lived in Austin County, south of Brenham, and, with several other persons from Austin County, came, but not together, to Brenham, in Washington County, to attend a circus. Deceased was the only man in the crowd that was armed. He had with him during the day a large-sized Colt's six-shooter, loaded with cartridge and conical balls. He carried the pistol in his boot, in the morning, but, it hurting his foot, he borrowed a pair of saddle-bags and put his pistol in them; he then carried the saddle-bags around on his arm during the balance of the day, and took them with him on leaving town. Ward and Davis were friends. Mahlman and Davis had had a difficulty, but made it up when they met in Brenham, on the day of the circus, and had spent the evening in friendly intercourse in Brenham, drinking freely, and some of them to excess, while they remained in town. Ward got very drunk, noisy, and boisterous, towards night, and was run out of town on his horse by a policeman. Ward dropped his hat in his flight. He passed out of town, south, on the Austin County road, and was seen by the witnesses Stone and his son, about dusk, three-fourths of a mile beyond the scene of the homicide, bare-headed — having lost, also, the stirrups to his saddle, and his saddle-blanket — returning towards Brenham, in search of his hat, etc.

Mahlman and Ward were large men; Davis, a small man. Davis and Mahlman left town together, carrying Ward's hat. On their way out of town, Mahlman inquired of Davis if he had any whisky with him; Davis said he had not. Mahlman said he had part of a bottle, but not enough, and that, if Davis would give him 25 cents, he would go back up town and get another bottle, he having but 25

cents left.   Davis gave him the money, and Mahlman went
back and got the whisky.   On his return, Davis and he
rode off together.   It was then about dark; Mahlman hav-
ing his saddle-bags.

Not very long after this, two large men are seen by the
witness Lehman, fighting near a ravine about one mile and
a half from Brenham, some seventy-five yards from the spot
where Mahlman's dead body was subsequently found.   A
smaller man was standing two yards off, holding three horses;
he was not taking any part in the fight.   Although the par-
ties were not fully identified by this witness, it is virtually
admitted by counsel on both sides, in their arguments and
briefs, that the persons seen by Lehman at the ravine were
Mahlman, Ward, and Davis; that Ward, on his return to-
wards town, had met Davis and Mahlman, and that Ward
and Mahlman, when seen by Lehman, were fighting on the
ground.

The witness Lehman, being alarmed, passed on; before
going very far he heard a pistol fire.   On his return home
through the lane, in company with another boy, some thirty
minutes after the report of the pistol was heard, they dis-
covered the dead body of Mahlman lying, not where he
(Lehman) had seen the fighting, but about seventy-five
yards up the hill towards Brenham.   The limbs of the dead
man had been straightened out, the feet brought together,
the hands folded across the breast, as if laid out for burial;
evidently the work of some other hand after the death strug-
gle was over.

On the examination of the dead body two wounds were
found, which are described by the coroner — who is also a
physician — as follows:   " The windpipe of deceased had
been pierced with a small knife, a sharp instrument, that
made an incision straight up and down, in which I could get
my little finger.   This was not a mortal wound.   A good
deal of blood had flowed from it and run down deceased's

breast, making the front of his shirt quite bloody. Deceased came to his death, in my opinion, from another wound. This was a gunshot wound. A ball had entered his body, entering and passing through the lower part of the left shoulder-blade. This ball passed, apparently, diagonally through the body, and was found by me under the skin, and cut out just about an inch and a half below the right nipple on the breast of deceased. It was a conical ball, of an ordinary pistol. * * * The gunshot wound was mortal, and must have produced instant death.''

Deceased's hat was found near the body. The saddle-bags were not far off; his horse was feeding a few yards from the dead body, the bridle-reins having fallen over the horse's head. There was blood on the saddle and on the horse's withers. Ward's hat was found lying some yards south of the body, between it and the saddle-bags.

Dock Martin testified that '' I live on E. M. Smith's place. On the night of May 23, 1877, a short time after dark, I was on my way from Smith's to Maria Mason's house; when about two hundred or two hundred and fifty yards from the gully in the lane, I heard some men quarreling at the gully; they seemed to be scuffling on the ground; I heard cursing; in a short time I heard one cry out, ' Catch that man's horse;' a voice replied, ' I can't; God damn him, he hit me on the head with a bottle, in town;' the other voice said, ' Get on your horse, and we'll follow the gentleman and settle him,' or ' settle up with him;' I heard two horses start towards Brenham, then a pistol fired, and a man cried ' Oh;' one horse ran on a piece and stopped; the other horse stopped when the pistol was fired.''

The witness Maria Mason, who lived, as shown by the record, about 250 yards north-east of the point where the dead body was found, testified that '' I heard some men quarreling down the road, near the ravine; I think

I heard several voices.   *   *   *   In a short time, just as I was going into the house, I heard a pistol-shot, and heard a man cry out ' Oh ;' heard two horses, as I thought, run off after the shot fired ; did not distinguish anything more, as my dogs ran down towards the fence, barking and making a great noise.   In a few minutes I saw a man walking rapidly from that direction towards the house ;   *   *   *   did not know the man ; heard him called John Ward afterwards ; he was bleeding from a blow or cut on his head, and seemed to be drinking.   *   *   *   Ward took out his pocket-knife and wiped it on his pantaloons once or twice ; he dropped it ; picked it up again, wiped it, and put it in his pocket ; he seemed uneasy and scared, and said he did not know what minute fifteen or twenty men might ride up and kill him.   He said that he and William Mahlman and Hall Davis were together in the road, when Mahlman shot him. I said, ' What did Davis do ?'   He said, ' Hall Davis tried his best to keep Mahlman from shooting me.'   He said his hat was in the road ; he knew when he dropped it."

The witness Smith says that, being sent for on the night of the homicide, he went down to the house of the witness Maria Mason, where he found Ward, who complained of his head ; said he had been shot twice.   He was holding his hands on the top of his head, which was bleeding freely from a wound or cut.   "I examined it ; it was not a gun-shot wound."   *   *   *   The witness further testified :   " I heard some German boys hallooing down at the road, about two hundred and fifty yards off; they said there was a dead man in the lane ; I went down at once ;   *   *   *   Maria Mason, John Ward, and Dock Martin came down about this time ;   *   *   *   I saw no signs of a struggle at or near the body on the ground ; about seventy-five yards, at least, from the body, south, in the valley of the ravine, I saw signs in the sand of a scuffle.   *   *   *   I saw here a broken whisky-bottle ; about it was a fresh place where some whisky had

soaked into the ground. John Ward came up to where the body was and claimed one of the hats, which lay some thirty or forty yards south of the body; he went right up to the dead body and looked at it; said he did not recognize it; he was tolerably drunk. Ward stayed about fifteen or twenty minutes in the sand, near the dead body, before he left; he went off through the field on foot. I wanted him to stay, but he seemed eager to get away. He seemed to be uneasy and scared, up at the house."

Another witness, who lived on the opposite side of the lane, heard quarreling in the lane, the fire of the pistol, and the noise made by a horse, or horses, running, about the time that the pistol fired.

On the trial of the cause the state introduced the witness J. M. Jackson, who stated, on direct examination, that on the night of May 23, 1877, the defendant, Davis, came to his house about ten o'clock, P. M., in company with R. G. Landrum, having in his possession a dark sorrel horse (afterwards recognized by the witness as belonging to the Ward family) and a pistol, which was shown by the evidence as the pistol of William Mahlman, the deceased, which horse and pistol were delivered by Davis to the witness Jackson, with the request that the horse and pistol be identified. The defendant, on cross-examination, asked the witness if Davis, at the time, made any statement in regard to the manner in which he had come into possession of the horse and pistol; to which the witness replied that he had. The defendant's counsel then asked him what Davis said; to which the state, by its counsel, objected, on the ground that the same was not competent or pertinent, and the court sustained said exceptions; to which the defendant excepted and took a bill of exceptions.

It is proper we should here state that the statement of facts shows, when the counsel for the state asked the witness if Davis carried the pistol and horse off, or left them

at witness' house, to which witness replied, " he left them with me to be identified," that counsel for the state then told the witness to answer his questions, and not to state anything that Davis said to him. The answer of Davis, however, was not excluded from the jury, or any motion made to exclude it. It may be presumed that, had such a motion been made in the court below, it would have prevailed. The evidence was before the jury, and when the counsel for the accused, on cross-examination, sought to draw out the whole conversation, the court, at the instance of the prosecution, would not allow it.

Article 3129 of the Code of Criminal Procedure (Pasc. Dig.) provides that, " when part of an act, declaration, or conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other ; as where a letter is read, all other letters on the same subject, between the same parties, may be given in. And when a detailed act, declaration, conversation, or writing is given in evidence, any other act, declaration, or writing, which is necessary to make it fully understood, or to explain the same, may also be given in evidence."

We believe that the district judge who presided at the trial erred in sustaining the objections made by the state, and in excluding from the jury the declarations made by Davis to the witness at the time he left the horse and pistol with him, which were sought to be drawn out by defendant's counsel. What Davis said at the time he delivered the horse and pistol to witness are verbal acts. When evidence of an act done is put in evidence by the state, his declarations made at the time, having a tendency to elucidate, explain, or give character to the act, are also admissible. When a person does any act material to be understood, which is put in evidence by the state, all his declarations made at the time of the transaction, and expressive of its character, motive, or object, are regarded as verbal acts

indicating a present purpose and intention, and are, therefore, admitted as proof, like other material facts.    *Ward* v. *The State*, 41 Texas, 611; 1 Greenl. on Ev. 108.

In the case at bar the conclusion of guilt was deduced from circumstantial evidence. Of these the possession of the horse of his co-defendant and the pistol of the deceased, within an hour after the homicide, were circumstances upon which the state relied in proving defendant's guilt. The prosecutor has the option to decline introducing testimony of a fact which he supposes may be satisfactorily explained; but, should he offer it, if the explanation offered is inconsistent with itself or with the probabilities arising from surrounding circumstances, it will tend to strengthen, rather than weaken, the presumption of guilt arising from the facts in evidence.

It is true that a defendant may thus manufacture testimony for himself, but he cannot become the actor in introducing such testimony in evidence. He cannot offer proof of any act of his own, and thus lay the foundation for the introduction of his declarations accompanying that act.

The acts or declarations of a prisoner are not admissible evidence for him unless they occurred within the period covered by the criminating evidence, or tend in some way to explain some fact or circumstance proved against him, or to impair or destroy the force of some evidence for the prosecution. 31 Ala. 342. When part of a conversation is drawn out by either party to a cause, the other is entitled to have the whole conversation go to the jury for their consideration; but the truth of the whole, or any part, may be judged of from the declaration itself, or from other testimony overruling or controlling those portions of the admissions making against the party offering it.

The remarks of the judge who presided at the trial, to which the defendant took the fifth bill of exceptions, were but reasons given by the presiding judge to counsel for his

rulings upon objections to evidence. We think that no harm could possibly result from such remarks as were made by him to the defendant's counsel. A judge cannot be too careful in avoiding remarks relating to the evidence, or tending in the slightest degree to convey to the jury his opinion of the evidence offered by either party.

Upon a motion for a new trial the verdict was attacked by affidavits attempting to show misconduct on the part of the jury, and the bailiff who had them in charge. Counter-affidavits cover every charge made, and completely rebut and explain each fact stated in the motion.

The questions in regard to the separation of the jury were discussed by our Supreme Court in the case of *Jones and Jones* v. *The State*, 13 Texas, 168. In that case the court says: "When the jury, or any number of them, have separated without the consent of the court, we believe the following rules, laid down by Judge Green in *Hines* v. *The State*, 8 Humph. 597, are correct, and should be observed: 'First, that, the fact of separation having been established by the prisoner, the possibility that the jury had been tampered with, and received other impressions than those derived from the testimony in court, exists, and *prima facie* the verdict is vicious; but, second, the separation may be explained by the prosecution showing that the juror had no communication with other persons, or that such communication was upon subjects foreign to the trial, and that in fact no impressions, other than those drawn from the testimony, were made upon his mind; but, third, in the absence of such explanation, the mere fact of separation is sufficient ground for a new trial.'"

In other subsequent decisions our Supreme Court have held substantially that something more than separation, or that one or more of the jurors were seen apart or standing near outside persons, is required to affect the fairness of a verdict. It must affirmatively appear that there was such

misconduct that showed a fair trial was not had. Pasc. Dig., art. 3137; *Jack* v. *The State*, 26 Texas, 1; *Johnson* v. *The State*, 27 Texas, 770; *Nelson* v. *The State*, 32 Texas, 73; *Jenkins* v. *The State*, 41 Texas, 132; *Wakefield* v. *The State*, 41 Texas, 556; *Austin* v. *The State*, 42 Texas, 357; *Marsh* v. *The State*, 44 Texas, 42; *Gilleland* v. *The State*, 44 Texas, 356.

These last cases were affirmed in *Early* v. *The State*, 1 Texas Ct. App. 257, which was reversed upon the special grounds therein stated, taking it out of the rule in the above cases, under which, however, the case at bar expressly comes. In the case of *Early* v. *The State*, this court, after referring to a number of decisions on this question, uses the following language: "Another general rule which we think may be safely deduced from the weight of authorities upon this subject is that a separation of the jury before bringing in their verdict in a capital case does not, *per se*, render the verdict void, but such verdict will be set aside, or not, according to the circumstances."

Applying the law to the facts in this case, after carefully reading the affidavits offered on both sides, we believe that, under any rule ever followed or laid down by either the Supreme Court or Court of Appeals, the motion for new trial should not have been granted on account of the alleged separation of the jury without permission of the court, or on account of the misconduct of the bailiff having them in charge, as complained of by the defendant, and set out in the third, fourth, fifth, and sixth grounds for a new trial.

The charge of the court was unexceptionable, eminently fair, and as favorable to the defendant as the law strictly authorized. The court did not err in refusing the instructions asked by defendant. The correct principles of law contained in them, and proper to be given in charge to the jury, had already been given in the general charge.

The reasonable doubt and presumption of innocence are

charged substantially in the language of the statute, and, as stated by counsel for the prosecution, they appear throughout the charge with unnecessary elaboration; it was not error to refuse to repeat them at the request of the defendant.

The judgment of the lower court is reversed and the cause remanded.

*Reversed and remanded.*