## W. T. WASSON v. THE STATE.

1. JURY — SPECIAL VENIRE. — In forming a jury from a special *venire*, no objection is perceived to calling several of the *venire* together and swearing them simultaneously to answer questions respecting their qualifications as jurors; but the questions should be put to them separately and consecutively, and not *en masse*. The first on the list should be first interrogated, and, if found qualified, be accepted or rejected before the next is interrogated; and in like consecutive manner the others should be examined and passed upon, until the jury is formed or the *venire* exhausted.

2. CHARGE OF THE COURT. — Whenever there is evidence of facts which, with reasonable probability, may influence the finding of the jury, it is the duty of the court to charge the law pertinent to such facts. If such evidence be in conflict with other evidence, the conflict is for the solution of the jury, and not for that of the court in its instructions to the jury.

3. SAME — SELF-DEFENSE. — See evidence which made it incumbent on the court below, in the trial of a murder case, to give in charge to the jury the law of self-defense and justifiable homicide.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. NOONAN.

The facts immediately involved in the rulings are fully set forth in the opinion. Three witnesses were introduced by the state who saw part of the fatal difficulty between the appellant and Woodson, the deceased. The general purport of their testimony was similar to that of the witness Vincent, the most material part of which is set out in the opinion of this court. They, however, did not see Woodson have a hatchet, or any other weapon.

The verdict was manslaughter, with two years' confinement in the penitentiary.

*Hutcheson & Carrington*, for the appellant.

*George McCormick*, Assistant Attorney General, for the State.

ECTOR, P. J.  W. T. Wasson, the defendant, was in-
dicted for the murder of Charles Woodson.  The jury
found the defendant not guilty of murder, either in the first
or in the second degree, but guilty of manslaughter, and
assessed his punishment at confinement in the penitentiary
for the term of two years.  The motion for new trial was
overruled, and the case is now before us on appeal.

One of the errors assigned by the defendant is the action
of the District Court in overruling the exceptions taken by
defendant's counsel to the manner of forming the jury,
which is shown by the transcript.  As the court did not
sign the bill of exceptions which was prepared by defend-
ant's counsel and tendered, we copy it as we find it in the
record, with the explanation of the judge who presided at
the trial.

" The defendant further excepted that the court con-
ducted the examination of the jurors touching their qualifi-
cation by having them sworn, to answer questions, in squads
of four, and then addressing the question of qualification to
all four at one and the same time, to which they were called
upon to answer at one and the same time, there being but
the one question simultaneously asked of all four; and at
the time of the said action of the court, repeated at each
stage of examining the whole *venire*, the defendant excepted
for the following reasons to said mode of examining the
jury on their qualification :  First, that it was contemplated
by the law and is the practice of this state to call and ex-
amine one juror at a time touching his qualification ; second,
that the question did not have the same direct and impressive
force, testing the conscience of the juror, when so addressed
to a group of four as when addressed to the one individual
juror ; third, that the answers of the four were liable to the
influence of each other, and a man swift to nod his head or
say ' yes ' or ' no ' to a question so addressed to four might in-
fluence one or more of the four of the group questioned

with him; fourth, that the answers of four men could not so easily be comprehended or observed, and repeatedly defendant's counsel could not hear the answers of the four, or some of them, and indicated this fact to the court at the time, but the court dismissed the suggestion with the remark that ' I am not responsible for the inability of counsel to observe the answers of the jurors; I know the answer, and it is my province to decide on their qualification;' and for these, among other reasons, the defendant excepts and presents this bill of exceptions, and asks that the same be signed, sealed, and filed of record in this cause.''

The court made the following indorsement on the above bill of exceptions, to wit: '' The foregoing exceptions are not allowed or approved. But, lest there should be any misapprehension as to their purport, they are permitted to be incorporated with the record. The jurors were sworn, four at a time, to answer questions, but their responses to the questions propounded were taken separately; each juror deemed by the court as qualified seemed to comprehend very clearly the questions asked, and each juror distinctly answered the several questions put to him touching his qualification.''

In the shape that this bill of exceptions comes before us we would not feel called upon in this case to decide as to the proper manner to be observed in impaneling a jury, if we had not been specially asked to do so.

We can see no error in calling up any number of the special *venire* and swearing them together to answer questions asked them by the court, or under its directions, touching their qualifications as jurors; but the jurors upon the trial of a capital felony, when examined by the court, should be examined separately. The name of the first man on the list should be called; he should be examined alone touching his qualifications to serve on the jury, and, if pronounced a competent juror, be accepted or rejected before

another name is called; that then the second name on the list should be called, and this juror be passed upon in the same manner, and so on through the list of names on the *venire* until it is exhausted or the jury formed.

Upon the trial of a capital offense, the law provides that a special *venire facias* shall be issued for persons, not less than thirty-six nor more than sixty, for the purpose of forming a jury. Pasc. Dig., art. 3016, and following.

It is further provided that, in "forming a jury, the names of the persons summoned shall be called in the order they stand upon the list, and, if present, shall be tried as to their qualifications, and, unless challenged, shall be impaneled." Pasc. Dig., art. 3024.

In the case of *Horbach* v. *The State*, 43 Texas, 242, and also in the case of *Mitchell* v. *The State*, 43 Texas, 512, the Supreme Court of this state held that it is proper, in a capital case, to require the party to pass upon each juror as called. And this court, at the Tyler term, 1877, in the case of *Taylor* v. *The State*, followed what we have understood to have been the correct and settled practice in the formation of the jury in causes of this kind, and as held by our Supreme Court in the cases above cited.

The third and fourth errors assigned by the defendant are as follows:

"3. The court below erred by refusing to give to the jury who tried the cause the charges asked by the defendant's counsel.

"4. The court below erred by omitting to give to the jury before whom the cause was tried any charge in regard to the law of self-defense or justification."

A detailed statement of all the evidence on the trial is not necessary for a proper understanding of the questions presented in the above assignment of errors. It appears from the evidence that defendant and the deceased were

camping together in Schroeder's wagon-yard, in the city of San Antonio; that a difficulty suddenly sprang up between them in regard to moving camp, which resulted in defendant's killing Woodson.

On the trial of the cause a little girl by the name of Lizzie Jackson was called to the stand as a witness for the defendant. She was first questioned by the court, for the purpose of testing her competency to testify as a witness in the case, and in response to questions asked by the court she answered: " My name is Lizzie Jackson; am going on ten. I can read and write; am going to school; can spell ' Baker.' I go to Sunday-school half a year." Question: " What do they teach you there?" Answer: "God made me; they teach me to tell the truth at home and in Sunday-school." The court permitted the child to make statements without being sworn. She says: " I was at the ditch; I saw the killing; big man did it with a pistol; shot him. I saw the man that was shot; little man had hatchet in his hand; big man ran away; little man was the one who was shot; big man had pistol. I was by big china tree, by sidewalk. One man had a gun; was fighting with it; big man who had on blue pants; little man struck big man with hatchet. Three of them were quarreling; man with blue pants commenced the fight; next, big man commenced; had a pistol; little man had hatchet in hand when he was shot; big man tried to take gun from other man. I was on sidewalk; was eight or seven feet from where I was standing to where men were quarreling. I was playing outside; little man got the hatchet from wagon and struck big man; big man shot him; little man quarreled with big man; I was going along street; was resting by ditch; looked through fence; nobody was standing near wagon; did not see man with bucket near wagon. Saw defendant; man with white vest on; little man was near big man when he tried to hit him with

hatchet; have not been asked how it happened by any one before; talked once with T. G. Anderson, and Hutchison once, about it."

W. T. Vincent, for the defense, testified as follows, to wit: "I came here with Wasson, Dillon, and Quinn. On Saturday evening I was in Schroeder's yard, about two or three o'clock. I first saw Woodson; was sitting on a cot belonging to us. Wasson came up, and I asked him who he was; said it was a man named Smith; from that time till about an hour by sun were in the yard; somewhere about that time a man named R. Grimes came, and another gentleman with Mr. Grimes; stopped in yard where Wasson was; we were acquainted, from Grimes County; wanted us to camp with him out of town. Wasson and I agreed to do it; he was to select a camp, and we were to come on as soon as Dillon and Quinn came from town; put coffee-water on and kindled fire, and was fixing something to eat. Wasson and I then went into Schroeder's store to get our things and to settle our bill. Wasson paid bill, received saddle-bags and gun. About that time Dillon came in; asked what we were going to do; told him were going to move camp out of town; said no, rather we would not move that day — that he had made arrangements with Mr. Baker to go out on Martines, on following day, to sell some land. Wasson said no, we had made our arrangements to go, and that we would go. Dillon then took gun; he (Wasson) and I started out into the yard; about half-way from gate to wagon we met Quinn going into store for some bread. We then walked on to wagon, Wasson and I stopping at front of wagon. Dillon said he would water horses, and went to rear of wagon; at time we went to wagon Woodson was sitting on cot; he asked Wasson, 'What are you up to?' He told him we were going to move camp out of town. He said to Wasson, 'You can't treat me in that way; you are a damned dirty son of a bitch.' There was

a hatchet lying by the cot; he picked the hatchet up, raised it, and started towards Wasson; made two or three steps, and by that time Wasson drew his six-shooter from saddle-bags hanging on his left arm, and shot him. Woodson turned and ran, or, rather, walked off fast, and fell near Schroeder's wagon-yard gate. Wasson stood there a very short time, then left the yard. The cot was three or four feet from the fire; Wasson was five or six steps from fire, near the wagon. Mr. Dillon was at rear of fire; I was near Wasson. There had been no quarrel that day. I have never seen Woodson before. I was with Wasson when he got saddle-bags. Mr. Dillon carried a gun; think he had a striped suit of linen; had on shoes; do not think this is Mr. Wasson's pistol. Wasson fired only one shot; Woodson turned and went towards the gate. I went with Mr. Dillon when he examined the ground. I am brother-in-law of Wasson; married his sister. After killing, I was arrested at wagon-yard and brought to court-house. Had Woodson turned towards the gate, his left side would have been towards Wasson." Cross-examination: "Testified several times in this case, in this court first. I, Quinn, and Dillon were on trial. I testified before coroner's inquest on dead body of Woodson; did not on that trial testify to Woodson having the hatchet. I had my reasons for not doing so — because there was great excitement, and I feared that our party would have been mobbed if I had told the true story. We had no friends in town; everything seemed one-sided; party arrested us. I think Jackson arrested me; do not know whether he was policeman or not. I was afraid of mob in court-house — appeared great excitement; larger crowd than now; officers had to keep crowd back; thought there was a good chance of them hanging. I was not afraid of county attorney; did not fear officers, but outsiders. I, as witness, was afraid to tell the truth for fear of San Antonio mob. *  *  *  We testified on Saturday night.

\* \* \* I was examined after Dillon and Quinn. I signed and swore to it Saturday night."

The court charged the jury the law applicable to murder in the first and second degrees, and to manslaughter, and further instructed the jury, as follows, to wit: "The defendant shall be presumed to be innocent until his guilt shall have been established by legal proof. If you have a reasonable doubt as to the guilt of the defendant, you will give him the benefit of the doubt and acquit him."

The defendant asked the court to charge the jury as follows: "If the jury believe that the defendant killed Woodson at the time he was making an assault upon him which put him in reasonable apprehension of his life or of some serious bodily harm, then you will find him not guilty; such killing is in the law in self-defense, and justifiable;" which charge the court refused to give.

It is the duty of the court to charge the law applicable to the facts; and whenever there are facts that would influence a jury, in any reasonable probability, it is the duty of the court to submit the law in charge which is pertinent to those facts. Pasc. Dig., art. 3059; *Johnson* v. *The State*, 27 Texas, 766; *Bishop* v. *The State*, 43 Texas, 402; *Johnson* v. *The State*, 43 Texas, 614; *Lister* v. *The State*, *ante*, p. 17.

From an examination of that portion of the testimony which we have copied from the record, we believe that it was clearly the duty of the district judge who presided at the trial to charge the law of self-defense in this case. There were only two witnesses, as appears from the statement of facts, who swear they saw the shot, or saw either party at the time the fatal shot was fired. Both of them say that the deceased was near the accused, advancing on him with an uplifted hatchet, in the act of striking him with it.

If there was any conflict between these and the other

witnesses, it was the province of the jury, and not of the court, to reconcile it. It will not do to say that the defendant's witnesses show they are unworthy of belief. This is not the province of the court to determine. The only theory on which it is possible to account for the refusal of the court to charge the law of self-defense is that it judicially determined the deceased was not near enough to put the accused in a reasonable expectation or fear of death or some serious bodily injury — thus attempting to relieve the jury of the duty of determining this question of fact. The competency of a witness is always a question for the court, and his credibility for the jury. We believe that the court should have given the first charge which was asked by the defendant, or should have instructed the jury as to the law of justifiable homicide.

The judgment of the District Court is reversed and the cause remanded.

*Reversed and remanded.*