[No. 1889.]

William Adams *alias* Guillermo Adams *v.* The State.

1. Continuance — Diligence — Affidavit to Take the Depositions of a Witness in a Criminal Cause.— Depositions in criminal causes, though unknown at common law, are authorized by the Code of this State. But in order to avail himself of that manner of proof, the defendant, as a prerequisite to obtain a commission to take depositions, must file an affidavit which in all respects complies with the requirements of article 764 of the Code of Criminal Procedure. To make and file such an affidavit is as essential to due diligence in seeking a continuance for the want of the depositions, as it is to apply for process for a witness who is within the jurisdiction of the court. See the statement of the case for an affidavit *held* insufficient.

2. Same — Depositions in Foreign Countries.— Article 762 of the Code of Criminal Procedure provides that "The rules prescribed in civil cases for taking depositions of witnesses shall, as to the manner and form of taking and returning the same, govern in criminal actions, when not in conflict with the requirements of this Code." An objection to depositions, that they were taken and returned by an officer not authorized by law, is an objection which goes to the manner and form of taking and returning depositions. *Held*, that in absence of a provision in the Code of Criminal Procedure prescribing the rules of taking, in criminal cases, the depositions of witnesses residing beyond the limits of the United States, the rules prescribed in civil cases (R. S., art. 2226) obtain; and as those rules designate a consul of the United States as an officer qualified to act in civil cases, he is likewise qualified to act in criminal cases — the said article of the Revised Statutes not being in conflict with the Code of Criminal Procedure.

3. Same — New Trial.— However correct the ruling of the trial court refusing a continuance because of the want of diligence, if the evidence adduced on the trial discloses that the absent testimony was material and probably true, it becomes matter addressed to the discretion of the trial court in passing upon the motion for new trial. But see the statement of the case for a *resumé* of absent testimony which, considered in connection with the facts proved on the trial, was not probably true, and hence was not such evidence as would authorize the award of a new trial.

4. Murder — Fact Case.— See the statement of the case for evidence *held* sufficient to support a capital conviction for murder.

APPEAL from the District Court of Maverick. Tried below before the Hon. D. P. Marr.

Upon evidence which established against him a murder rarely paralleled in wanton atrocity, the appellant in this case was convicted of murder in the first degree, and awarded the death penalty. His victim, Josefa Galindo, before she yielded her life, a final though an unwilling sacrifice to the man upon whom she had bestowed her affections, fell first a victim to his lust, and died by his hand, while, perhaps, pleading with him for the civil reparation, which only he could make. The murder was committed on the 10th day of March, 1885, in Eagle Pass, Maverick county, Texas. The indictment was presented on the 1st day of June, 1885, and the trial and conviction followed on the 6th day of the same month.

J. A. Sumpter was the first witness for the State. He identified the defendant in court as William Adams, whom he knew quite well. The witness resided in the town of Eagle Pass, Texas, on the 10th day of March, 1885, and was a deputy sheriff of Maverick county at that time. The defendant lived something over one hundred and thirty steps distant from the witness's residence, in a house which fronted on the same street. Witness had occasion to get out of bed and go into his yard, about 2 o'clock on the morning of March 10, 1885. Just as he was re-entering his house he heard four or five reports of a gun or pistol, followed by the scream of a woman. Witness seized his pistol and ran down to the point of the shooting as rapidly as he could. When he reached a point nearly opposite the defendant's house, he heard the defendant say, in Spanish: "They are robbing me; they are robbing me." Defendant was then standing inside of his gate, talking to another Mexican, and asking him to summon one Don Hipolito. He was, at the same time, going through the process of reloading his pistol. Witness then asked the defendant what had occurred. He replied: "They are robbing me." Witness then told him to open the gate and admit him. Defendant did so, and witness asked him where the robbers were. He replied that two had run off and he had shot one, and pointed towards the body of the deceased lying on the ground. Witness started towards the body and heard a gurgling sound, like blood in the throat of a person dying, and upon the instant, not having seen the person lying there, suspected who it was. About this time Judge Burks walked into the yard, and up to the prostrate body, and said: "Why, this is the woman that rascal seduced." Judge Burks then turned to defendant and asked him in

Spanish: "My God, man, why did you do this?" Defendant replied: "Because she has been molesting me for more than three hours, and would not let me sleep." Defendant then turned and started towards his house. Witness followed, and caught defendant's pistol with his left hand, and drew his own with his right hand. Mr. Fox, who had come up, also caught the defendant. Witness ordered the defendant to surrender his pistol. The defendant asked if witness was an officer, and on being answered in the affirmative, surrendered the pistol.

When the witness asked the defendant to indicate the direction taken by the two robbers who escaped, the defendant pointed up the street towards the witness's house. Witness was in his front yard when the five shots were fired, and it would have been impossible for any one to have passed that house, going up the street, immediately after the shooting, unseen by the witness. The body of the deceased lay in the defendant's front yard, near the house and between the house and the front fence. When witness reached the defendant's front gate, he found the gate locked with a padlock and chain, and the defendant was standing at the gate on the inside, in the act of loading his pistol. The defendant's pistol had been recently discharged, and had three chambers empty, when witness got it. Judge Burks reached the defendant's house very shortly after witness did,— perhaps within less than a minute's time. Witness knew the deceased, but had no recollection of seeing her during the week immediately preceding her death. She was not quite dead when the witness reached the scene, but died within thirty seconds. She was dying when witness passed into the yard, and she was gasping then. The other man, who was at the gate with defendant when witness arrived, Felix Ramirez by name, was not armed, nor did witness find any other arms about the place except the pistol in the hands of the defendant. Defendant told Ramirez to go and bring Don Hipolito Billiard to his house, which Ramirez did. The killing occurred in Eagle Pass, Maverick county, Texas, on the morning of March 10, 1885. Witness was certain that it was later than 12 o'clock on the night of the 9th, and thought it was as late as 2 o'clock on the morning of the 10th.

Cross-examined, the witness stated that the night of March 9–10, 1885, was a bright starlight night. Witness located the place of the shooting by the sound. Witness could see readily from his house to the defendant's house, and could easily see an object as large as a man, as far off as a hundred yards. He saw no object, animate or inanimate, between his house and defendant's. The

shots described were fired at the defendant's house. Witness counted four shots, and was morally satisfied that a fifth was fired while he was securing his own pistol. Witness had good reason to suppose something serious had happened, if the screams of a woman following the rapid firing of a pistol can be called a good reason. In going to the defendant's house, he went down the street on the opposite side from the defendant's house. It was the defendant's exclamations "*me roben; me roben!*" which caused the witness to cross the street to the defendant's house. Witness crossed the street, asked the defendant the occasion of the shooting, and then demanded admission. Defendant said nothing in reply to witness's demand for admission, but took a key from his pocket and unlocked the padlock which secured the gate. The yard fence around the defendant's house was a high one. Witness heard him tell the man who was with him to jump over the fence and go for Don Hipolito. The man and Don Hipolito came to the house afterwards, together. Defendant did not ask witness to jump the fence. Witness was brought to the defendant's by the pistol shots. Defendant's pistol had been fired five times, and three of the five chambers which had been fired had been reloaded when witness got possession of the pistol. The pistol was a six-shooter. The deceased was known as Josefa Galindo.

Judge J. F. Burks was the next witness for the State. He testified that he lived in Eagle Pass in March, 1885. On the morning of the 10th day of that month the witness, who was at home in bed partly sleeping, was suddenly awakened by the rapid firing of a pistol and the screams of a person, whom, from the voice, he took to be a woman. Witness's wife called to witness to get up. William Sumpter, a son of the previous witness, came hastily to the witness's house and asked if witness had a pistol. Witness replied that he had not, but requested young Sumpter to wait a moment, which he did, and witness and he went together to the place of the shooting. When witness reached the defendant's house he found J. A. Sumpter and others already there. He next saw and recognized the dead body of Josefa Galindo lying in the yard. On recognizing the deceased, witness turned to the defendant and said: "You have killed the girl you seduced; why have you done it?" He replied: "Because she has molested me all night, and would not let me sleep." Witness had frequently seen the deceased, and knew her by sight, but not by name. Witness had seen the defendant in the presence of the deceased before he saw him in the presence of her dead body. On the night of March 7, 1885, the witness went with

the deceased to the house of Don Hipolito Billiard, where the defendant then was. As he and deceased entered the house the defendant saluted the witness. Witness, returning the salute, told the defendant what the deceased had previously told him,— that he, defendant, had seduced her and promised to marry her, and witness asked defendant if he was willing to comply with his promise. Defendant answered by asking the question: "How can you prove it?" Deceased replied: "I have your letters to prove it." Defendant refused to marry the girl, when witness and she left the house and witness advised her to go home. She replied that she was afraid to go home, and asked if witness could not secure her quarters for the night, which witness did at the house of one of her friends. Witness next saw the deceased on the night of March 9th,— the night before the morning of her death. She was then near the house of Mr. Haynes, about one hundred yards from the house of the defendant. The girl whom witness saw dead in defendant's yard on Tuesday morning was the same girl who went with him to Don Hipolito Billiard's on Saturday night. The girl was dead when the witness reached her body, he having started from home almost immediately after he heard the shooting. Witness lived about one hundred steps from the defendant's house on the same street, but on the opposite side of the street. Witness and J. A. Sumpter lived on the same side of the street, their houses nearly adjoining. The stars were shining brightly. No person could have been on the street in the vicinity of witness and have escaped his observation. Defendant did nothing while witness was at his, defendant's, house. He was not arrested during witness's stay, which was very brief. Witness heard four, and, he thought, five shots. He was dozing at the time, and was fully aroused by the pitiful and heartrending screams of the deceased.

Cross-examined, the witness stated that several persons were at defendant's house when he arrived, J. A. Sumpter among them. The yard gate was open when witness got there. Witness's remark that defendant had killed the girl he had seduced was made to the crowd as well as to the defendant, and he spoke so that all present heard. He recognized the dead body of Josefa Galindo as soon as he saw it. Witness did not go with the deceased to the residence of Don Hipolito Billiard for the purpose of asking the defendant to marry Josefa, but went with her at her request as an escort. She said that she wanted to remain all night with the family of Don Hipolito. She gave as her reason for not staying, that the family had no room for her. The conversation with the defendant at Don

Hipolito's house was the result of the meeting there of the parties.

Doctor A. H. Evans testified, for the State, that he examined the dead body of Josefa Galindo between four and six hours after her death. The ball entered her breast from the front and passed out behind, near the spinal column. It severed some large blood vessels and was the immediate cause of her death. The wound was necessarily fatal, and must have produced death almost instantly.

J. A. Sumpter, recalled, testified, for the State, that the pistol in evidence was the weapon he took from the defendant, within a very few minutes after the killing. Five chambers of the pistol had been recently fired, three of which were freshly reloaded. Witness saw the defendant in the act of reloading his pistol. Mr. Kelso picked up some recently exploded cartridge shells at the point where the defendant reloaded his pistol. The shells exhibited were of the kind used with pistols of the same manufacture as that of the pistol in evidence. The cartridge, and one of the shells exhibited, fit the pistol exactly. The other shells exhibited fit also, but are a little smaller, the result of their explosion.

T. L. Oglesby testified, for the State, that the pistol in evidence was a forty-four caliber Colt's frontier six-shooter, and the shells exhibited are the shells of forty-four caliber cartridges, such as used in pistols of the make described.

W. Kelso testified, for the State, that the cartridge and shells mentioned in the testimony of Mr. Sumpter and Captain Oglesby were picked up from the ground in the defendant's yard, by the witness, on the morning of the killing, between 8 and 9 o'clock, since which time they have been in witness's exclusive possession. Witness found them on the ground between the gate and the body of the deceased, and near the gate. The State rested.

Hipolito Billiard was the first witness for the defense. He testified that he had known the defendant, whose name was William Adams, about seven years. Defendant lived in the witness's house for two or three months. The witness also knew the deceased, who came to his house one night with Judge Burks. He knew of her death, because on the morning it occurred the defendant sent for witness with the message that he had killed some one. Defendant had removed from witness's house to his own, a few days before the killing. On reaching the defendant's house on that morning, witness saw the dead body of a woman lying in the front yard. The man who came for the witness was a man whom the witness knew well, but whose name he could not now recall to mind. That man told witness that defendant had sent for him to come quick, as

he had killed a person. The messenger did not say whom defendant had killed. Deceased came to the witness's house about 8 o'clock on the night of the killing, and asked for the defendant, with whom she said she wanted to have a talk. Witness told her that defendant was at his own house. She then asked witness if she could stay all night at his house. Witness told her no, and that, if she had any friends, she had better go to them. Deceased was killed before day next morning.

J. A. Sumpter was then called as a witness for the defense. He took the stand and testified that when he asked the defendant which way the two robbers went who escaped, he pointed to the corner of his fence, and said that they went out that way, and thence up the street on which the witness lived. The witness came to the defendant's house down the very street up which the defendant said that the retreating robbers went, and knew that no person had gone up that street. Witness could not have failed to see any person passing up that street at that time, for he was in plain view of that street, from the moment the first shot was fired until he got to the defendant's house. Witness testified at the examining trial. He could not now say whether, before that tribunal, he made a statement of what he saw and heard on that night, or whether he testified in response to questions. It was his recollection, however, that he made a statement. He testified on that proceeding as he did on this as to the direction indicated by the defendant as the route taken by the alleged robbers in their flight.

William Cooper testified, for the defense, that he lived in the house adjoining the house of the defendant on the south. Witness was at home in bed at the time of the killing, and knew nothing of the facts in this case. Witness gave Mr. Kelso a bullet which he found in a closet in his yard. Witness was asleep at the time of the killing, and did not go to the scene of the tragedy until after the arrest of the defendant.

Mrs. Edith Monte testified, for the defense, that she lived next door to the defendant and knew him by sight. Witness was awakened on the morning of March 10, 1885, by the firing of a pistol and the screaming of a woman, but she did not get up until she heard Mr. Sumpter's voice. Witness heard talking before she heard the shots, but she did not know what was said, as she did not understand the Spanish language. The witness had occupied her present residence since January, 1885. Defendant's house had been built since that time. Witness had never heard shooting on defendant's place prior to the morning mentioned.

At this point the defendant introduced a sketch or diagram of the

premises on which the killing occurred, which sketch showed the location of the house and others adjoining it, the position of the gate, fences and other objects on and about the premises, the place where the body of the deceased was lying, and the place where the defendant was standing when J. A. Sumpter arrived; also where certain bullets had entered and gone out of the house, and where one had gone through the fence into Cooper's premises. He introduced also certain pieces of lumber cut from the house, showing the bullet marks or holes where they entered. "The diagram, as explained by the evidence, shows that three shots or bullets struck defendant's house in front, and one the fence, and that all were fired from or in the front yard; that the dead body of Josefa Galindo was found lying in the front yard between the gate and the door of the house, but much to the right on entering, and nearer the gate than the door. The shot holes were discovered in the house and fence on the morning of the homicide."

H. Robinson, one of the defendant's counsel, testified in his behalf that he was familiar with the premises of the defendant, and since the homicide had examined them in detail. The sketch in evidence was a correct one, and was made by actual survey, in the presence of the witness, by a man named Perry, about two weeks prior to this trial. Witness knew nothing of the facts of this case.

The defense next read in evidence the testimony of Felix Ramirez before the examining trial, as reduced to writing by the magistrate who presided over that trial. Ramirez was the man sent by defendant to summon Don Hipolito Billiard after the killing, and for whose deposition the defendant sought a continuance. The instrument in evidence reads as follows:

"I was in the house of Mr. Adams. I know nothing of the killing, because I had been asleep. I was awakened by this man Adams hallooing to me. Adams was on the outside of the house. I then got up and put on one shoe, and then Adams told me to go for Hipolito. I did not hear any shots fired at all. I did not hear the woman talking before the defendant Adams called me. I never saw Adams have any arms. I had just come the day before and went to bed. I did not know the dead woman. Adams asked me to sleep there. He asked me to do so on the street. I knew Adams before in Zaragosa, Mexico. Adams gave me no reason why he desired me to sleep there. I did not hear the shooting nor did I tell any one so. I was awakened by the hallooing of Mr. Adams. I had never slept in the house before. I went there to sleep about 9 o'clock. I always sleep soundly. I am a musician by occupation.

I live with Jesus Maria de la Zerda. Adams met me in the street. Adams was carrying a bucket of water. It was about 9 o'clock P. M. It was about a square off from where Adams lives that we met. We went together directly to the house in which Adams lives. I heard no shots fired during the night. He, Adams, told me to go for Hipolito and tell him he had killed a man. I heard no shots at all. I never went to Oppenheimer's store with the deceased. I did not know her. I did not go with her to a German's house. We did not sleep in the same bed, but in beds about two yards apart. Adams went to bed about the same time I did. I did not hear the girl come there. I was not present when Adams shot the woman. Adams locked the door with the key when he went to bed. I told Hipolito that Adams had killed a man and to come down there. I did not tell Hipolito that Adams had shot a woman. I did not see the body of the woman as I went for Hipolito. I was gone about five minutes after Hipolito. I saw Mr. Fox as I went for Hipolito. Mr. Sumpter was not at the gate when I went for Hipolito. Adams was standing outside of the house when I got up, about three varas away. I heard no noise until Adams called me. Adams was standing in front of the house when I came out. I heard the hallooing, but I could not tell whether it was by a man or woman."

The affidavit upon which the defendant applied for a commission to take depositions of witnesses residing in the Republic of Mexico, and which is the subject-matter of the first head-note of this report, reads as follows:

" The State of Texas ⎞
          v.              ⎬ Suit pending in Maverick County District
   William Adams.   ⎠ Court.

"Before me, the undersigned, clerk of the above named court, personally appeared Harai Robinson, of counsel for the defendant, and on oath avers that he is a duly authorized representative of the defendant, and that for his, the said Adams's, defense the testimony of the witnesses named by the affiant in the notice filed in this office yesterday, June 2, that a commission would be applied for to take depositions according to accompanying interrogatories, is material and indispensable for the defense of said William Adams, and that this is filed as supplement to said notice. June 3, 1885.

(Signed)                                        " Harai Robinson.

"Sworn to and subscribed before me on above day and date.

                                        " O. C. Dowe,
                              " Clerk D. C. Mav'k Co., Texas."

Omitting the showing of diligence set out in the application for

a continuance, which is disclosed in the opinion, the application proceeds as follows:

" Defendant expects to prove by the said witness (Felix Ramirez) that he, the said witness, was sleeping in the house of the defendant on the night that the deceased was killed, and that, when the firing occurred which caused the death of the deceased, witness was called by the defendant to go and call assistance to resist an attack then being made upon his house and himself by three men, of which witness became aware also. Also of Estanistado Rodriguez, living in Piedras Negras, Mexico, distant from Eagle Pass one mile, for procuring whose testimony the same diligence has been used as with reference to the witness Felix Ramirez, by whom defendant expects to show that said witness had been solicited by friends of the deceased to go to the house of the defendant on the night of the killing for hostile purposes to defendant, and to make an attack on defendant, and that he had communicated this fact to defendant, and in consequence thereof defendant had procured the company of Felix Ramirez to sleep in his house the night of the killing. Also of Guadalupe Hernandez and Donociano Hernandez, who both lived in Zaragosa described above, and for procuring whose testimony the same diligence has been used as with reference to the preceding witnesses. That by Donociano Hernandez defendant expects to prove that on the night of the killing, and immediately preceding the killing, witness passed in the street close to the house of the defendant, and saw three or four persons inside of the inclosure close to the house of the defendant, waylaying the same. That by Guadalupe, that on the Sunday previous to the killing, witness had been staying at the house of the defendant, and that defendant was in real and serious apprehension of a murderous attack being made upon him, and witness was dispatched by defendant to Zaragosa to appeal to the father of the defendant. That defendant expects to show in his defense that deceased was killed accidentally in the defendant's defense against a murderous attack being made upon his person at his own door, in the darkness of night, by persons unknown to defendant, who were seen to escape through the rear of defendant's premises during and immediately after the shooting. . . ."

The motion for new trial raised the questions discussed in the opinion.

*E. J. Hamner* and *Teel & Haltom*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge.　About 2 o'clock A. M., March 10, 1885, in the town of Eagle Pass,· Maverick county, the defendant, with a pistol, shot and killed a woman named Josefa Galindo.　He was immediately arrested and confined in jail.　On June 1, 1885, the grand jury returned into court an indictment charging him with the murder. On June 5, 1885, the cause was called for trial, when the defendant presented an application for a continuance, alleging the absence of testimony material to his defense, which application being overruled by the court, the trial was proceeded with and resulted in the conviction of the defendant of murder in the first degree, and the assessment of the death penalty.

It is assigned and earnestly insisted upon by defendant's counsel that the court erred in refusing the defendant's application for a continuance.　This action of the court is properly presented in the record by bill of exception, and demands consideration.　It is shown by the application that on the 2d day of June, 1885, the day after the indictment was returned into court, the defendant by his counsel filed with the clerk of the court interrogatories and notice for the purpose of obtaining the depositions of four witnesses alleged to reside in the State of Coahuila, in the United States of Mexico.　On the 3d day of June, 1885, the State by its attorneys waived service of notice and interrogatories, and also time, and on the next day filed cross-interrogatories, and on the same day the clerk issued a commission to take said depositions, and delivered it to defendant's attorney, who immediately proceeded with it to Piedras Negras in Mexico, near to which place said witnesses resided, and placed the same in the hands of B. Pridgen, the consul of the United States at that place, and paid said consul the fees for taking said depositions, and said consul promised forthwith to take and return the same, but the same had not been taken and returned when the case was called for trial.

On the 3d day of June, 1885, the next day after filing said interrogatories and notice, defendant's counsel made and filed with the clerk an affidavit stating that the testimony of said witnesses was material to the defendant; but said affidavit did not set forth the facts necessary to constitute a good reason for taking the depositions of said witnesses, nor did it state that defendant had no other witness, whose attendance on the trial could be procured, by whom he could prove the facts he desired to establish by the depositions. The application for continuance was controverted as to diligence by the State in due form, the grounds of the traverse being that the affidavit above mentioned was defective, and that the commission to

take depositions had been delivered to an officer who was not law-fully authorized to execute the same. No objection was made to the sufficiency of the application in other respects, and in such other respects we think it is in strict compliance with the statute.

As to the affidavit, which constituted the basis of the defendant's right to a commission to take the depositions, it is manifestly and substantially defective. It does not in a single particular comply with the statute. (Code Crim. Proc., art. 764.) At common law depositions in criminal cases are unknown. It is only by virtue of our statute that they can be taken and received in evidence, and hence, when a defendant seeks to avail himself of this mode of mak-ing proof, he must comply at least substantially with the require-ments of the statute. (*Johnson* v. *The State,* 27 Texas, 758.) Failing to do so, he fails to use the diligence in obtaining his testimony which the law exacts from him. The affidavit required by article 764, Code Criminal Procedure, is a material requirement of the stat-ute, and constitutes the very foundation of the defendant's right to take depositions. To make and file such affidavit is as essential to due diligence, in our opinion, as it is to apply for process for a wit-ness who is within the jurisdiction of the court. This being our view, we hold that the court did not err in holding that the defend-ant had not used due diligence to obtain the depositions.

As to the authority of the consul to take the depositions, we are of the opinion that that officer has such authority, by a fair and reasonable construction of our statutes. It is not expressly con-ferred upon him by our Code of Criminal Procedure (Code Crim. Proc., art. 760), nor is it expressly denied to him. In fact there is no express provision of our Code of Criminal Procedure which pre-scribes the rules for taking depositions where the witness is beyond the limits of the United States. In civil cases, the provisions of the statute are ample, and the officers who are authorized to take depo-sitions without the United States are designated, and among them is named a consul of the United States. (Rev. Stats., art. 2226.) By article 762 of our Code of Criminal Procedure it is provided that "The rules prescribed in civil cases for taking depositions of witnesses shall, as to the manner and form of taking and returning the same, govern in criminal actions, when not in conflict with the requirements of this Code." In the case of *Pauska* v. *Daus,* 31 Texas, 67, it was held by our supreme court that an objection made to depositions, that they were taken and returned by an officer not authorized by law, was an objection to the manner and form of taking and returning depositions. If this decision be correct, and we are not disposed to question its correctness, then the authority

of the officer relates to the manner and form of taking and return-
ing the depositions, and comes within the scope and meaning of
article 762 of the Code of Criminal Procedure, and makes article
2226 of the Revised Statutes apply to depositions in criminal cases
in so far as to empower a consul of the United States to take such
depositions; because said article 2226 is not in conflict with any pro-
vision of the Code of Criminal Procedure.

But notwithstanding the application for continuance was properly
overruled because due diligence to obtain the absent testimony had
not been exercised, still, if upon the trial the evidence adduced dis-
closed the materiality of such absent testimony, and that it was
probably true, it would be matter addressed to the discretion of the
court, to be considered in passing upon defendant's motion for a new
trial.

In order to determine whether or not the absent testimony is of a
character which would entitle the defendant to a new trial, we
must first examine the evidence adduced on the trial. We will
briefly state the substance of that evidence as we find it in the rec-
ord. Three days before the homicide, the deceased, in the presence
of witnesses, accused defendant of having seduced her under a
promise of marriage. He did not deny the accusation, but asked
her if she could prove it. She answered that she could prove it by
his letters. She importuned him to marry her, which he refused
to do. Defendant lived by himself in a house which was sur-
rounded by a high yard fence, there being a gate in the fence in
front of the house. In front of his house was a street, and around
his premises the ground was open, there being nothing to obstruct
the vision for some distance. On the night of the homicide the
stars were shining brightly. A witness who resided about one hun-
dred and forty steps from defendant, and on the same street, testi-
fied that he was standing in his yard in full view of the street
and of defendant's premises when the first shot was fired; that five
shots were fired, all in the direction of defendant's house; that he
immediately went out upon the street, and along the street to a
point opposite defendant's house, and saw defendant standing near
his front gate, inside the yard, with a pistol in his hand which he
seemed to be loading, and heard defendant cry out three times,
"they are robbing me." He went to where defendant was and
found the front gate locked. He told defendant to unlock the gate,
which he did. Witness then entered the yard and discovered the
dead body of deceased lying upon the ground between the gate and
the house. Witness asked defendant which way the robbers had
fled, and he pointed to the street and in the direction of where wit-

ness lived.  In a few moments another witness came into defendant's yard, and recognized the dead body of the woman as that of Josefa Galindo, and remarked in the presence of the defendant that she was the woman that the defendant had seduced.  To this remark the defendant made no reply.  This last witness then asked the defendant why he had killed the woman.  His reply was that she had been molesting him all night, and would not let him sleep. Deceased was shot in the breast with one ball, which produced almost instant death.  It was stated by the first witness that he was in plain view of the street leading from his house to the defendant's, all the time from the firing of the first shot to the time that he entered defendant's yard, and that he saw no one pass along said street during said time, and that no one could have passed along said street without his observing them.  Other witnesses also, who lived in the immediate vicinity, and who were aroused by the pistol shots, and who were in a position to see any person who might leave defendant's premises, state that they saw no person leave said premises in any direction.  Defendant's pistol showed that he had fired five shots.  Three of the balls discharged had lodged in the front part of the house, one had gone through the yard fence at one side of the house, and the other had killed the deceased.  All the witnesses agree that but five shots were fired.  The balls lodged in the house and fence indicated that they had been discharged from a point in the front yard in the direction from the house of the front gate.

The theory of the defense was, and is, that the deceased and two men, her friends, had invaded the defendant's premises for the purpose of doing him violence; that he rushed out of his house to defend himself, and opened fire on his assailants, and shot and killed the deceased.  In support of this theory the testimony of the absent witnesses was sought.  It is stated in the application for continuance, in substance, that by the testimony of said absent witnesses facts can be proved which establish, or strongly tend to establish, said theory.  That the testimony sought was material we do not question.  But can it reasonably be said, in view of the evidence adduced, that it is probably true?  We think not.  The theory of the defense, to our minds, is contrary to all the evidence in the case; contrary to the defendant's confession made immediately after the murder; contrary to reason, and extremely improbable.  When asked why he had killed the woman, defendant advanced no such theory in justification of the deed, but gave as his only reason for it that she had been molesting him and would not let him sleep. He said nothing about an attack having been made upon him.  He

pointed to no sign or evidence that any one had been inside his yard,— not even a track. His fence was high and his gate was locked. Is it reasonable to suppose that men and the deceased could climb the fence into the yard, and the men climb out again, and yet no indication of their entrance or exit be left upon the premises? Is it reasonable that men would enter his premises for the purpose of doing him violence, and after being shot at five times scamper away without an effort to kill or injure the object of their malice? Is it reasonable that these men could escape from the premises in plain view of witnesses, in the bright light of the stars, without being seen or heard by some one? We cannot believe it at all probable, in fact not even possible, in view of the facts proved on the trial, that the testimony of the absent witnesses, as stated in the application for continuance, is true. We do not think an intelligent jury would give to it any credence whatever. We think the evidence as developed on the trial fully justified the trial judge in refusing the application for continuance upon its merits, and that said absent testimony is not entitled to consideration in determining defendant's motion for a new trial.

As to the charge of the court, it is, in our opinion, substantially correct, and as favorable to the defendant as the most liberal view of the evidence would warrant. It submits clearly and fairly every issue presented by the evidence, and is, in no material respect, deficient.

We find nothing in the record which would justify even a suspicion that the defendant has not had a fair and impartial trial. It is true that his trial was unusually speedy, but it cannot be inferred from this fact that it was not perfectly fair and impartial. By his own confession and by all the evidence it was conclusively shown that he killed an unfortunate, helpless woman — a woman whom he had seduced under a promise of marriage, and that he had committed this cruel murder for no other reason than to free himself from the importunities of his disgraced victim to fulfil his promise and marry her, and thereby to some extent save her from the reproach which he had brought upon her. She had doubtless gone to his house on that fatal night, and had been suffered by the defendant to enter his premises, but, renewing her importunities for justice at his hands, he determined to rid himself of her forever, and fired the shot which murdered her whom he had already degraded. The extreme penalty of death of is not too severe for such a murderer.

The judgment of conviction is affirmed.

*Affirmed.*

[Opinion delivered November 4, 1885.]