Johnson v. The State.

W. R. JOHNSON v. THE STATE.

An erroneous ruling by the court below in holding that a juror who is challenged for cause is a good juror, whereby the defendant was forced to a peremptory challenge, affords no ground for a reversal of the judgment, unless it appears that the defendant exhausted his peremptory challenges before a jury was obtained; and when the record is silent as to the fact, this court cannot infer that the defendant did exhaust his peremptory challenges before the jury was obtained.

The mere surmise that the defendant, by means of such erroneous ruling, may have been induced to accept jurors whom he would otherwise have rejected, is altogether too hypothetical and imaginary to authorize a reversal of the judgment.

Objections to evidence not taken in the court below are not available in this court, and dying declarations are not an exception to this rule.

Depositions cannot be admitted in criminal cases except upon the conditions and with the restrictions prescribed in the Code of Criminal Procedure; and the consent of the district attorney and the defendant to the taking of a deposition otherwise than in accordance with the provisions of the Code will not, it seems, make the deposition admissible, if objected to at the trial on behalf of the State.

Though in every case of felony the court is required by statute to give a written charge, whether asked by the parties or not, yet it is only necessary for the court to give such instructions as are applicable to every legitimate deduction which the jury may draw from the evidence.

When a party who has taken the life of another relies upon threats against his own life as an element in his defence, he must show that at the time of the killing some act was done by the deceased from which he, the accused, might reasonably infer an intention of immediately carrying such threats into effect; in which case the accused was justified in the use of such means as were in his power for his own defence, and if death ensued thereby the homicide was justifiable.

But in no case can mere antecedent threats, not accompanied by some demonstration indicative of their immediate execution, either justify the homicide of the party who made them, or reduce it from murder to manslaughter; and there is nothing in the 596th article of the Penal Code to countenance a different conclusion.

The jury were instructed that they could "take into consideration all the facts and circumstances surrounding the parties at the time of the killing." Held, that this authorized the jury to consider of antecedent threats made by the deceased against the life of the accused, and which, it was also proved, had been communicated to the accused.

Johnson v. The State.

That the jury misunderstood the charge of the court and were thereby misled in finding their verdict, is not recognized by the Code as cause for a new trial.

No case has yet occurred in this State wherein the courts have tolerated affidavits of jurors made to impeach their verdict. If ever admissible they can only be allowed in an extreme case and under an imperative necessity for the accomplishment of justice.

If a juror, who is empannelled in a case of felony, expressly informs a person that he cannot converse with him about the case, this cannot be considered to be a conversation " in regard to the case " within the meaning of the 672d article of the Code of Criminal Procedure.

When a new trial on account of misconduct of the jury is claimed by virtue of the 8th clause of article 672 of the Code of Criminal Procedure, the granting or refusal of it is left to the discretion of the court, to be determined by the application of the facts to the result attained by the verdict.

Appeal from McLennan. Tried below before the Hon. W. Y. McFarland.

The appellant was indicted at the Spring Term, 1862, of the District Court of McLennan county for the murder of Demetrius Hays. The offence was charged to have been committed on the 21st day of December, 1861.

After various orders and continuances, the case came to trial at the Fall Term, 1864, when the defendant pleaded not guilty.

In the organization of the petit jury, one of the venire, A. G. Bondurant, on his preliminary examination, stated that he had been in the State of Texas for over one year, but that he was a refugee from the State of Louisiana, and claimed his citizenship there, and not in Texas; that he intended to return to Louisiana, though he had bought land and resided here. The court held him to be a good juror, and the defendant challenged him peremptorily and excepted to the ruling of the court. It does not appear either in the bill of exceptions or other part of the record whether or not the defendant exhausted his peremptory challenges before the jury was procured.

It was proved by several witnesses that the deceased was shot in one of the streets of Waco on the morning of the day laid in the indictment; and that immediately thereafter he stated, in reply to inquiries, that Bill Johnson had shot him and had killed him for nothing. Some of the witnesses testified to details of the

shooting as stated by the deceased, and that the deceased knew he was dying. He died in about two hours after being shot. This testimony went to the jury without objection, so far as appears by the record, but its admission is one of the errors assigned by the appellant.

The defendant proved by two witnesses, whose testimony is substantially the same, that they and the accused stayed at the house of Mrs. Parsons in Waco, the night previous to the morning on which Hays was killed; that on that morning the defendant left Mrs. Parsons' for the purpose of going up town to attend to some business; that defendant carried his gun and took with him his negro boy, also armed with a gun, as had been the habit of defendant ever since the killing of his brother, Houston Johnson; that defendant took the street he usually took when he went up town, he and his boy being on horseback; that some five or ten minutes before defendant left Mrs. Parsons', the deceased and his nephew, James D. Hays, had started down the back way to the river. The witnesses were standing in the porch, and their attention was called by a negro girl remarking "there goes Hays after Dr. Johnson." They then saw Hays riding up in a walk from the river to the street, in the direction of the street that Johnson was in; that after Johnson had passed the street that Hays was in and had passed the corner of the picketing and the house in the yard, Hays put his horse into a pace or trot, and rode up and turned the corner of the picketing into the street after Johnson. That after Hays had come into the street behind Johnson, the latter turned and shot, and Hays fell from his horse. One of the witnesses heard but the one shot; the other stated that Johnson fired a second time after Hays had fallen from his horse.

By Thompson Newby, a witness for the defence, it was proved that Hays had made threats against Johnson; witness did not tell Johnson of the threats, but told Miller that Hays was carrying his gun for Johnson, and Johnson told witness to tell Hays to quit carrying his gun for him, or he would be compelled to hurt him. That Hays said he had waylaid Johnson and Beauchamp, and if they had come along that night he would have got them. Hays told witness this just after Johnson and Beauchamp had had a

difficulty with Hays. That Hays made the worst of the threats on the evening or night after the difficulty, which was while the leaves were green and before corn was gathered, in the fall before Hays was killed. That Hays was in the habit of carrying his gun and six-shooter. On cross-examination the witness stated that he had never heard Hays threaten to attack and kill Johnson but once, and that was when he came home on the night that he said Johnson and Beauchamp had attacked him on his way from town. That his head was bleeding and cut with a stick, and he said Johnson had broken his walking stick over his head, and that Beauchamp had shot at him; that after he had come back from lying in wait that night, he said if they had come along he would have got them; that Hays showed witness the place he lay in wait for them; it was in the corner of his own field which witness was cultivating. That Hays' way of making threats was that if Johnson did so and so, he, Hays, would do so and so; and in this way witness had often heard Hays threaten Johnson up to the time of his death.

C. B. Tuning, a witness for the defence, testified that he had heard Hays threaten Johnson; that Hays came to witness' house and asked him if he had some large buckshot, saying that his shot were too small and he wanted some larger ones; that he intended " to set them up, or fix them up," meaning Johnson and Beauchamp; that this was a day or so after Johnson and Beauchamp had a difficulty with Hays. That witness told Johnson what Hays said about him, and about his wanting buckshot; and also told him that he thought he was not safe, and he had better take some one with him when he went about.

Isam Farris, for the defence, testified that he heard Hays say that he and Johnson could not live in the same range and travel the same road.

There is other evidence in the record introduced by the defence, and relating to the previous killing of Houston Johnson, a brother of the defendant, by one Ensaw; in which, it seems, Hays had been accused of participation.

With reference to the evidence of antecedent threats by Hays introduced by the defence, the court charged the jury, as follows:

"The defendant, Johnson, seeks to justify or excuse the killing of Hays on the ground of threats made by Hays to take the life of him, Johnson. Now, threats by Hays to kill Johnson, do not afford a justification for Johnson's killing Hays, unless it be shown by the evidence that at the time of the killing, Hays, by some act then done, manifested an intention to kill Johnson.

"In ascertaining the guilt or innocence of the defendant, the jury have the right to take into consideration all the facts and circumstances surrounding the parties at the time of the killing, which were given in evidence before you. If the defendant, at the time of the killing, had a reasonable apprehension that it was the intention of Hays to make an immediate assault on him and take his life, or do him some great bodily harm, he had the right to defend himself, and it would make no difference whether the danger was real or imaginary, so that it had the appearance of being real. But, in order for Johnson to justify himself on this ground, you must believe from the evidence that the circumstances surrounding the parties were such as to create a just and reasonable apprehension, such as would convince the mind of a reasonable man beyond all reasonable doubt, that it was the intention of Hays to make an immediate assault on Johnson, and take his life or do him some great bodily harm; and if you so believe, you will by your verdict find the defendant not guilty. But Johnson had no right to kill Hays under the apprehension that Hays might kill him at some future time; and if that was the motive that induced Johnson to kill Hays, he was guilty of murder in so doing."

The defendant by his counsel asked the court to instruct the jury:

"1st. If the jury believe from the evidence that from all the circumstances in the case that the defendant had reasonable grounds to believe, at the time of the killing, that it was necessary to kill Hays to save his own life, or from great bodily harm, then the killing was neither murder or manslaughter, but self-defence.

"If the court instructs as to threats under the statute, section 612, then the following instructions are asked:

"2d. Section 612 governs and is applicable only when the defendant seeks to justify under threats alone.

" 3. No statute law can abridge, circumscribe, or lessen the right of self-defence."

The court refused these instructions, and the defendant excepted.

The jury convicted the accused of murder in the second degree, and assessed his punishment at five years in the penitentiary. Judgment accordingly.

The defendant moved for a new trial upon all the usual grounds, and also because " the jury in this case, after being empannelled and sworn, separated without the consent of the court, the State, or the defendant;" and also because "the charges of the court were given in such a way that the jury were misled in the case, and said instructions were contrary to law."

In support of his motion for a new trial, the defendant filed sundry affidavits. Three of the jurymen swore that their construction of the charge of the court excluded all facts and circumstances in proof, that occurred previous to the morning of the difficulty, and all the threats made previous thereto by the deceased against the life of the defendant; and, also, that it excluded the evidence with reference to the killing of Houston Johnson. That if they had thought it was intended by the court for them to take into consideration the threats and conspiracy against the defendant, they would have done so, and their verdict would have been different, and would have been for the acquittal of the defendant.

One affiant (not of the jury) swore that during the progress of the trial, he had conversed with one of the jurymen, "and they spoke together of the trial of W. R. Johnson, then in progress;" but by a subsequent affidavit of the same affiant, and an affidavit of the juryman referred to, it appears that nothing relative to the case was said, except that the juryman informed the affiant that he was on that jury, and could not talk to him.

Other affidavits with reference to a separation of the jury were filed, but need not be particularly set forth.

The court overruled the motion for a new trial, and the defendant excepted.

The defendant appealed and assigned nine causes of error, nearly all of which are sufficiently indicated in the foregoing statement

of facts, and in the opinion of the court    The 6th assignment was as follows: "The court erred in its main charge to the jury, in instructing them only as to the offence of murder in the first and second degree, and omitting to instruct them as to what circumstances would reduce the offence to manslaughter; thus forcing the jury to the conclusion, that if they found the defendant guilty of any offence, it could not be less than murder in the second degree."

*F. W. Chandler, M. H. Bowers,* and *R. N. Goode,* for the appellant.

*Attorney General,* for the appellee.

MOORE, J.—We have given to the questions in the record now before us, that careful and patient consideration which the nature of the case demands, but after the strictest scrutiny, find no error to justify the reversal of the judgment.    Most, if not all of the assignments of error worthy of consideration have, in fact, been passed upon and settled, adversely to the appellant, in cases heretofore before this court.    In disposing of the questions now presented, it is therefore scarcely necessary for us to do more than to refer to our former decisions.

In responding to the errors assigned upon which we feel called to comment, we will follow the order in which they have been presented by the counsel who have argued this case for the appellant at the bar.

1. Although it is admitted that the court below erred in holding Bondurant to be a good juror, (Const. State of Tex., art. 3d, secs. 1 & 2; C. C. P., art. 575, clause 3, and art. 578;) yet such ruling, in view of the facts presented in the record, occasioned no injury to the appellant, and consequently furnishes him no ground for the reversal of the judgment.    It does not appear from the record, that the appellant exhausted his peremptory challenges. From its silence, we must infer the contrary.    The legitimate inference from the facts disclosed is, that, without exhausting his peremptory challenges, the appellant obtained from those sum-

moned on the first and second *venires*, a jury possessed of all the qualifications prescribed by the statute, with each of whom he was fully satisfied, and to whose decision he was willing to submit the determination of his guilt or innocence. A contrary ruling by the court would have given the appellant no greater number of persons from whom to select his jury than he has had. It has not lessened the panel, from which he was able to make a satisfactory choice. The mere surmise that he may have been induced by this ruling of the court, subsequently to accept jurors who, otherwise, he would have rejected, is not sufficiently sustained by reason or probability, and is much too hypothetical and imaginary to authorize the reversal of the judgment by this court. (Burrell v. The State, 18 Tex. R., 713: McGowen v. State, 9 Yerger, 184.)

2. In response to the second and third assignments of error, it is sufficient to say, that as far as it can be seen from the record, the evidence to which objection is now made went to the jury without objection. That this can not be done for the first time in this court has become, long since, too well settled to be the subject of comment, or to require the reference to authority in its support. No reason has been assigned, and none is seen, why evidence of the particular character now in question, should furnish an exception to the rule.

3. There was manifestly no error in the refusal of the court to admit the deposition of the witness, Henderson, in evidence to the jury. Depositions in criminal cases were unknown to the common law. They can only be received in our courts now, upon the conditions and with the restrictions prescribed by the Code of Criminal Procedure. Tested by it, the deposition was wholly and totally inadmissible. The consent of the district attorney, that it should be taken as was done, to be used upon the final trial, as stated in the bill of exceptions, could not abrogate or supply the requirements of the code, or give it effect as an instrument of evidence where it can not be so held by the law, without the aid of such agreement. (C. C. P., arts. 764, 780.)

4. The fifth assignment needs no remark, beyond saying, that the evidence objected to has no connection with or bearing

upon the issues involved in the case, and was only intended as a predicate for other testimony which was not admitted by the court. It is not embodied in the statement of facts; and if not expressly withdrawn or excluded where the purpose for which it was offered failed, this was no doubt regarded as tacitly done. It was so entirely insignificant as to attract, during the further progress of the trial, the attention of neither the court or the attorneys of either party.

5. The omission of the court to instruct the jury as to the circumstances which will reduce homicide from murder to manslaughter, is assigned as the sixth ground of error. In cases of felony it is made the duty of the court, by art. 594 of the Code of Criminal Procedure, whether asked by counsel or not, to deliver to the jury a written charge, in which it shall distinctly set forth the law applicable to the case. As has been often held, however, by this court, it is only necessary to give such instructions as are applicable to every legitimate deduction which the jury may draw from the facts. (Daniels v. The State, 24 Tex. R., 389; Monroe v. The State, 23, Id. 210; O'Connel v. The State, 18, Id. 343; Robinson v. The State, 15, Id. 311; Henderson v. The State, 12, Id. 537.)

A detailed statement of, or comment upon, the facts of this case, would be an unpleasant as well as unprofitable task on our part. It is sufficient for us to say that we are clearly of opinion that the judge in the court below was correct in holding, if the deceased was killed by the accused, which was not controverted, that the case was, unquestionably, either murder or justifiable homicide. The law upon this subject, if it were not sufficiently so before, has been clearly and conclusively settled by the provisions of the Code, so that "he who runs may read." And it is time that it should be looked to by every one as his rule of conduct, instead of his own passions, or a *pseudo* popular sentiment, that any one who has threatened another's life is an outlaw, or beyond the pale of legal protection, and may be slain with impunity by his enemy. If they do not, it is at least the imperative duty of those who do not make but administer the law, to follow and enforce its plain and obvious commands. The circumstances under which a party,

who takes the life of another, may rely upon "threats" as an element in his defence, is clearly shown by art. 612 of the Penal Code. If, at the time of the homicide, there is any act from which the accused may reasonably infer an intention to carry them into effect, he is justified in resorting to such means as may be then in his power, to defend and protect himself against their execution. If death ensues, it is justifiable homicide. But in no case under the provisions of the Code, or out of it, if we were permitted to look elsewhere to ascertain the law upon the subject, can it be held that mere threats, or threats unaccompanied by some demonstration, from which the accused may reasonably infer the intention of their execution by the deceased, either justify such homicide, or reduce it from murder to manslaughter. A different view of the law has been sought to be maintained by a reference to the third clause of art. 596 of the Penal Code, which is in the following language, viz: "The passion intended is either of the emotions of the mind known as anger, rage, sudden resentment, or terror, rendering it incapable of cool reflection." This clause is introduced into the Code in connection with preceding clauses of the same article, for the purpose of more clearly defining what was meant, in the definition of the offence of manslaughter, by the expression, "under the immediate influence of sudden passion," and it is preceded by the declaration, "that the provocation must arise at the time of the commission of the offence, and that the passion is not the result of a former provocation." Manslaughter itself is defined in the code as "voluntary homicide, committed under the influence of sudden passion arising from adequate cause, but neither justified or excused by law." The doctrine contended for must, therefore, be narrowed down to this simple proposition, that the mere fact of being encountered or overtaken in the street, or public highway, by one who has threatened another's life some months before, without any act whatever, indicative of an intention of then carrying such threat into execution, "is an adequate cause" to excite such "anger, rage, sudden resentment, or terror," as renders the mind "incapable of cool reflection." The bare statement of this proposition is sufficient for its reformation. If such was the case, the language of passion forgotten with the oc-

casion which gave it utterance, the idle tattle of the silly or the inebriate, must be paid for with the penalty of life. A full floodgate would be given to the most wicked passions, and murder, fearful as it already is, in a tenfold greater degree would stalk through the land, clothed in the panoply of the law.

6. The seventh assignment of error is based upon the supposition that the charge of the court withdrew from the consideration of the jury the previous threats of the deceased to take the appellant's life. We cannot, however, regard this as either a fair or legitimate construction of the charge of the court. Its import is obviously directly to the contrary. The jury were informed that they had " the right to take into consideration all the facts and circumstances surrounding the parties at the time of the killing, which were given in evidence," &c. What facts and circumstances were the jury to understand were here referred to ? Can any sane mind suppose that the court was thereby restricting the jury to the mere consideration of what transpired at and immediately preceding the homicide ? No facts or circumstances had then occurred to which this part of the charge could have any appropriate reference. The appellant had attempted the development of none such as the basis of his defence. Full two-thirds of the time the court was engaged in the trial of the case, however, must have been consumed in developing and expounding the evidence touching the alleged threats, conspiracy, and laying in wait by the deceased to take the life of the accused, as the ground of his defence. Although these things were antecedent occurrences, is it meant to be said that they were not vital, living facts and circumstances surrounding the parties at the time of the killing ? How can any facts and circumstances be said to surround parties, save as they connect themselves with, and are explanatory of their conduct and intention in the particular matter drawn in question ? Shall not all those, which are legitimately so connected, be properly said to surround the parties ? If more than we have said were necessary to vindicate this part of the charge from the severe criticism that has been passed upon it, it will be amply found in what is said in the same connection in the subsequent part of the charge. For the portion of it against which this objection has been pressed

with so much zeal, is but an isolated paragraph culled from the body of the charge. The fair and natural construction of the entire charge, and especially when taken in connection with the facts transpiring during the progress of trial, leave not the slightest ground for its misconception.

In connection with the objection to the charge, it is insisted that it was, in fact, misconstrued by the jury, and in proof thereof the affidavit of three of the jurymen was presented to the court on the motion for the new trial. Aside from the fact that this is not recognized by the code as a ground for a new trial, we may say that no case has yet occurred in which such affidavits have been tolerated in the courts of this State for the purpose of impeaching a verdict. And when we consider the wide door which would be thereby opened for improper practices, we would hesitate long, and feel ourselves constrained by imperative necessity for accomplishing the ends of justice, before we could give our sanction to such a practice. Although a few isolated cases may be found in which such affidavits have been received, the better practice seems to have been established in most, if not all the States except Tennessee, to reject them. The question has been before this court heretofore on more than one occasion, and it has been uniformly decided adversely to the appellant. (See Little v. Birdwell, 21 Tex. R., 612; Kilgore v. Jordan, 17 Id., 341.) We see nothing in the present case to invite us to a different line of decision. The affidavit of the jurors is not more clear than the instruction by which it is alleged they were misled; and if they failed to understand it, with all the light shed upon it by the transpiring events during the progress of the trial, it may be well questioned whether they fully understood the true import of the *ex parte* affidavit which was procured from them.

7. It would be a waste of time to comment upon the facts for the purpose of showing that the verdict of the jury is sustained by the evidence. The seventh assignment may, therefore, be passed without further remark.

8. The eighth assignment of error is the refusal of the court to grant a new trial. We have already partially disposed of this as-

49*

signment. We need only add in addition to what we have already said, that while it appears from the different affidavits a very irregular, loose and reprehensible practice in respect to the disposal of the jury in cases of felony, seems to have prevailed during the progress of the case, yet nothing is shown which required the court, under the provisions of the code, to grant a new trial. Article 672, of the Code of Criminal Procedure, expressly forbids the granting of new trials in cases of felony, except for some one of the causes enumerated in said article. There are but two of these which could be tortured into the slightest application to the grounds relied upon to support this motion. 1st. Where a juror has conversed with any one during the progress of the case. In one of the affidavits before the court, it is stated that one of the jurors and the affiant spoke together of the case during the trial. The juror, however, swears that, when approached by the affiant, he informed him that he was upon the jury and could not talk to him. And the truth of this statement is subsequently admitted by the affiant. The juror, then, did not converse about the case, but, on the contrary, refused to do so. 2d. The eighth clause in the article specifying causes for the granting of new trials, authorizes its being done, when, from the misconduct of the jury, the court is of opinion that the defendant had not received a fair and impartial trial. When the right to the new trial is rested upon this ground, the misconduct of the jury is evidently not of such character as unconditionally entitles the defendant to a new trial under some of the clauses of said article. The granting or refusal of it is, therefore, left to the discretion of the court, to be guided in its determination by the application of the facts to the result attained in the verdict. If the new trial was claimed in the court below upon this ground, the court, unquestionably, did not err in refusing it. In view of the facts of this case, as they are presented in the record, it cannot be plausibly insisted that the jury would have been warranted in finding a more favorable verdict for the appellant than they have done.

Some other questions have been presented in a brief of considerable elaboration, which we find filed with the record, but as

their discussion seems evidently intended rather as a criticism upon the law, as already recognized and settled, than to invite its judicial interpretation, it is unnecessary for us to say anything further than we have now done.

There is no error in the judgment, and it is therefore affirmed.

Judgment affirmed.