[Opinion delivered March 17, 1886.]

[No. 2063.]

## JEFF JACK *v.* THE STATE.

1. THEFT — EVIDENCE — PRESUMPTION.— The fact that the accused gave different and recently stolen articles away at the same time warrants, if unexplained, the conclusion that they were stolen at the same time.

2. SAME.— It is the province of the jury to determine the value of the stolen articles in a case wherein the testimony conflicts on that point, and, if the verdict is supported by sufficient evidence, it will not be disturbed by this court.

3. SAME — CIRCUMSTANTIAL EVIDENCE — CHARGE OF THE COURT.— The law of circumstantial evidence should be charged only in cases in which the inculpatory evidence is wholly of a circumstantial character.

4. PRACTICE — NEW TRIAL — MISCONDUCT OF THE JURY.— It is a well settled rule of practice that misconduct of the jury will not be ground for new trial unless it be shown to be such as affected the fairness and impartiality of the trial. See the opinion *in extenso* for misconduct imputed to a juror and relied upon as a ground for new trial, *held* insufficient. But, *quære:* Was the remark of the impugned juror misconduct within the meaning of the statute? Note the comments of the court on the question.

APPEAL from the Criminal District Court of Galveston. Tried below before the Hon. Gustave Cook.

The conviction in this case was for the theft of property over the value of $20, from M. W. Shaw, the owner, in Galveston county, Texas, on the 1st day of August, 1885. A term of three years in the penitentiary was the penalty assessed against the appellant.

Michael W. Shaw was the first witness for the State. He testified that a variety of articles were stolen from him in Galveston

county, Texas, between June 1, 1885, and August 3, 1885. Witness could remember of those articles the following:

| | | | |
|---|---|---|---|
| One set dinner china, valued at...................................... | | | $14.50 |
| One caster,         "       " ................................... | | | 6.00 |
| One nickel-plated watch, chain and charm...................value | | | 9.00 |
| One nickel-plated watch..................................... | " | | 6.00 |
| One locket................................................. | " | | 1.50 |
| One necklace and locket..................... ................ | " | | 6.00 |
| Two sets of coral jewelry................................... | " | $3.00 | 6.00 |
| One pair bracelets.......................................... | " | | 5.00 |
| One pair bracelets.......................................... | " | | 1.50 |
| One lace pin............................................... | " | | 4.00 |
| One pair earrings....... .................................. | " | | 2.00 |
| One necklace.............................................. | " | | 2.00 |
| One watch................................................. | " | | 6.00 |
| One watch chain........................................... | " | | 2.00 |
| One watch charm.................................·.......... | " | | 2.00 |
| Three nickel watches....................................... | " | 6.00 | 18.00 |
| One gold ring............................................. | " | | 5.00 |
| Fifteen cut-glass tumblers.................................. | " | 50c. | 7.50 |
| One pen and penholder..................................... | " | | 5.00 |

The witness missed the articles named early in August, 1885. Shortly after they were missed Ella Jones brought the set of dinner china and the caster to the witness. All of the other articles were recovered by the witness through officer James Cahill. Witness identified all of the articles returned to him by Ella Jones and officer Cahill as his property. They were all taken from him in Galveston county, Texas, without his consent. The defendant was employed about the store by the witness as porter. Witness did not sell him any of the articles or consent for him to take any of them.

Ella Jones testified, for the State, that the defendant gave her the dinner set of china, and the caster, some time in June, 1885. He brought the china and the caster to the witness at the same time. Witness asked him why he was giving her such expensive articles, and he replied that he wanted to give her something nice. He then told witness that he bought them from Mr. Shaw. He afterwards told the witness that he stole them from Mr. Shaw. When the defendant confessed to witness that he had stolen the articles, the witness was sick and unable to go out. As soon as the witness was able, she took the articles to Mr. Shaw, and told him where she got them. Defendant gave witness a necklace at another time.

Cross-examined, the witness testified that she could read and write. She had a quarrel with the defendant after the defendant told her that he had stolen the china and caster. She was sick

when the quarrel occurred, and was unable to go out to see Mr. Shaw. She did not write to Mr. Shaw, nor did she telephone him anything about the property then in her possession. She preferred seeing Shaw in person. She sent word to Shaw to come to see her, and Shaw sent her word to come and see him. Witness offered to sell the articles, but that was before defendant told her that he stole them. The quarrel had nothing to do with witness's return of the property to Shaw. She returned it to Shaw merely because defendant told her it was stolen property. Witness and defendant occupied the same room and were engaged to be married, and had procured a marriage license, when defendant presented her the articles. Witness denied that, when defendant moved to Gus Jefferson's house, she proposed that if he would pay her $6, she would not report the matter.

Officer Cahill testified, for the State, that he got the articles of jewelry, except the penholder, mentioned in the indictment, from Mr. Ephraim, the pawnbroker. The penholder he got from Mr. Megel. The cut-glass tumblers witness got from Ike Rector. All of the articles described were turned over to Mr. Shaw by the witness. Witness identified them as the articles now in court.

Mr. Ephraim testified, for the State, that he identified the watches and other articles of jewelry in court as articles which, during the last six months, were pawned with him by the defendant, and the same which he turned over to Mr. Cahill.

Ike Rector testified, for the State, that the defendant brought the cut-glass tumblers in evidence to his place as a sample, some time in the summer of 1885. Witness told defendant that he did not want the glasses, as they were too fine for his business. Defendant said that they could be bought cheap of Shaw. Witness turned them over to officer Cahill.

Matilda Jack testified, for the defense, that Ella Jones, the witness who testified in this case, was the kept mistress of the defendant for some time. Defendant and Ella were engaged to be married. The marriage license was secured, but the marriage was never consummated, because of a quarrel which separated the defendant and Ella. Ella sent the caster to the witness's house by George Wilson, offering to sell the same. Witness declined to purchase them. Ella made an effort to sell the caster and the china set to the witness's sister, Lucy Perkins, now living in Brazoria county. Ella knew, when she offered to sell the said articles, that they had been stolen. She told defendant at the time of the difficulty between them that she would "fix him," and that no other woman

could get him, defendant. At another time Ella threatened to send the defendant to Huntsville (the penitentiary).

G. W. Wilson testified, for the defense, that he was the person who, at Ella Jones's request, took the caster to Matilda Jack's residence for the purpose of selling it to Matilda. The proposed sale fell through. Ella knew at that time that the caster was stolen property. The witness heard Ella Jones threaten to "fix" the defendant, and to send him to Huntsville, shortly after the difficulty between her and defendant. Ella offered also to keep the matter of the theft secret if defendant would pay her $6. Witness lived with defendant and Ella while defendant was keeping Ella as his mistress.

Tom Jack testified, for the defense, that he was the father of the defendant. He often heard Ella Jones threaten to send defendant up the road. He heard Ella make those threats after her quarrel with the defendant. She was angry, and evidently meant what she said.

Mr. Renicke testified, for the defense, that the crockery and caster in evidence were worth between fourteen and fifteen dollars, and the tumblers about $5. Mr. Labadie estimated the value of the articles named at not exceeding $15.

Joseph Keenan and William Ritter testified that they had had the defendant employed in their saloons as porter. He frequently had opportunities to steal. They supported the defendant's reputation for honesty, and stated that they knew it to be good.

The motion for new trial raised the questions discussed in the opinion.

*W. L. Wilson*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WILLSON, JUDGE. I. Defendant gave the crockery and the caster to the witness Helen Jones at the same time. This fact is sufficient to warrant the conclusion that he took these articles at one and the same time.

II. As to the value of the crockery and caster the evidence is conflicting. Shaw, the owner of the articles, testified that their market value exceeded $20, while other witnesses placed their value at less than $20. It was for the jury to determine the question of value, and there being evidence supporting the verdict, this court will not disturb the finding of the jury.

III. This conviction does not rest alone upon circumstantial evi-

dence. Defendant told the witness, Helen Jones, that he had stolen the crockery and caster from Mr. Shaw. Hence the omission of the court to charge in relation to circumstantial evidence, or to charge fully upon that subject, was not error.

IV. It appears from defendant's motion for a new trial, and the testimony taken in relation thereto, that while the jury were deliberating upon their verdict a member thereof stated, in the hearing of some of the other members, that he had once been robbed by a porter. It is urgently insisted by counsel for defendant that this deprived the defendant of a fair and impartial trial, because it was proved on the trial that at the time defendant committed the theft for which he was being tried, he was employed in the capacity of porter, by Shaw, the owner of the goods stolen. The juror who made the statement complained of insisted that defendant should be more severely punished because he committed the theft while serving as a porter. He insisted upon assessing the punishment at four years' confinement in the penitentiary, but finally agreed to the period of three years. Nine of the jurors who tried the case testified before the court upon the hearing of the motion for new trial, and each of the nine stated positively that their verdict was not influenced by the statement complained of, but that they agreed to the term of imprisonment fixed by the verdict without being in the least induced to do so by said statement. It further appears that said statement was not made by said juror until after the jury had agreed upon a verdict of guilty, and that several of said jury, before said statement was made, were in favor of fixing the punishment at three years' confinement in the penitentiary, and some were in favor of making it four years, while two were at first in favor of making it two years. It very conclusively appears from the testimony of the jurors, that the statement complained of did not and could not have influenced the verdict upon the question of the defendant's guilt, and it is also clear that the jurors who heard the statement were not influenced thereby in assessing the punishment. It is well settled in this State that misconduct of the jury will not be ground for a new trial, unless it is shown to be such as has affected the fairness and impartiality of the trial. (*Jack* v. *The State*, 26 Texas, 1; *Johnson* v. *The State*, 27 Texas, 758; *Austin* v. *The State*, 42 Texas, 355; *Anschicks* v. *The State*, 6 Texas Ct. App., 524; *Allen* v. *The State*, 17 Texas Ct. App., 637.)

V. But we are not prepared to say that the statement of the juror, complained of, constituted misconduct such as the law contemplates as a ground for new trial, even if it did have the effect to

increase the defendant's punishment. The statement had no reference whatever to the question of defendant's guilt, and could in no way have affected the determination of that issue. It was a statement made by way of argument, explaining the juror's reasons for being in favor of assessing a greater punishment than in ordinary cases of theft. He had himself suffered loss by theft committed by his porter, and he thought that this class of employees should be dealt with severely when they stole the property of their employers, because they were trusted, and could not be watched and detected as others could be in whom no such confidence was reposed. We have found no decision in this or any other State which goes to the extent of holding such statements to be misconduct. It seems to us that it would be a dangerous and exceedingly pernicious practice for the courts to permit the sanctity of the jury room to be invaded, and jurors to be interrogated as to the arguments used in their deliberations, and the influence of such arguments upon their minds, and the reasons and considerations upon which their verdicts were based. There might arise, perhaps, an extreme case in which such a practice would be tolerated to prevent flagrant wrong and injustice, but this court would not be willing to sanction the procedure unless it should manifestly appear that the ends of justice imperatively demanded it. If it were permitted to attack and set aside a verdict because of arguments and reasons advanced and urged by jurors in their deliberations thereon, it would destroy free discussion and interchange of opinions among jurors. It would open the door to a searching inquiry in relation to every act and word which transpired in the jury room, and would subject each individual juror to be placed upon trial before the court to answer for the soundness and propriety of the opinions expressed by him in the jury room.

There is no warrant in the law for such a practice. While by our Code it is competent to prove misconduct by the *voluntary affidavit* of a juror (Code Crim. Proc., art. 777, subdiv. 8), it is nowhere intimated even that jurors can be brought into court by process and compelled to go upon the witness stand and testify as to arguments used, opinions expressed, and votes given by jurors in the jury room. Before the adoption of our Code, the affidavit of a juror was not admissible to prove even misconduct in the jury (*Cannon* v. *The State*, 3 Texas, 31), and such affidavits have never been regarded with favor by the courts. (*Hodges* v. *The State*, 6 Texas Ct. App., 615.)

We are of the opinion that the court did not err in overruling defendant's motion for a new trial, and that there is no error in the conviction; wherefore it is affirmed.

*Affirmed.*