## JOHN HIGHSMITH V. THE STATE.

### No. 1638. Decided June 14, 1899.

Motion for Rehearing Decided June 19, 1899.

**1. Bill of Exceptions—Filing.**

A bill of exceptions not filed until ten days after adjournment of the court can not be considered.

**2. Special Venire.**

The special venire had been duly summoned for jury service on the trial of two joint defendants. Defendants severed, and only one was tried, who was acquitted. Upon the severance the special venire were not discharged, but were ordered to report for service on the day set for the trial of the other defendant. In the meantime the counsel for the State and for defendant procured the issuance of an order for the summoning of another special venire for the second case. This second venire was duly summoned. But when the case was called for trial the court had the original or first venire, which had been used in the case of the joint defendants but never was discharged as aforesaid, placed in the box, and required the parties to select a jury from said original venire, defendant objecting. After the first venire was exhausted, the second venire was tendered defendant from which to complete the panel; and upon his refusal to accept them they were discharged, and the jury completed from talesmen summoned from the body of the county. Held, the ruling of the court was correct.

**3. Continuance—Diligence.**

Where it was shown on an application for continuance that defendant was arrested on the 6th of the month, but did not procure process for the witnesses, who resided in distant counties, until the 20th, and no excuse for not suing out process earlier is shown; Held, the trial being on the 8th of the next month, the diligence was not sufficient.

**4. Same—Threats.**

A continuance was properly overruled which was sought for a witness to prove that in a conversation with deceased in reference to a previous difficulty between the defendant and the son of deceased, he, deceased, threatened to kill defendant if he did not leave the country, where the time of making said threat and where the same was communicated to defendant are not stated, and where it appeared, moreover, that a year had elapsed since said previous difficulty and no effort shown to have been made by deceased to execute the threat.

**5. Same.**

A continuance was properly overruled which was sought for a witness by whom to prove threats and denunciations of deceased against defendant, where the time of the uttering the same is not stated. Such application is too vague and uncertain.

**6. Same—Uncommunicated Threats.**

A continuance was properly refused where the purpose of the absent testimony was to prove uncommunicated threats which could not possibly have exercised any influence upon the mind of defendant at the time of the fatal difficulty, and where such threats would serve but little purpose to intensify an act which defendant claimed was a deadly assault upon him.

**7. Evidence—Threats.**

Threats by deceased which are not shown to have any reference to defendant are inadmissible.

**8. Same—Declarations of Deceased.**

Declarations by deceased, in a conversation relative to a previous difficulty between his son and defendant, to the effect that on account of said difficulty he had been forced to pay costs greater than all his doctors' bills, was properly excluded as being immaterial.

**9. Dying Declarations—Predicate for—Practice.**

Where, upon request of defendant, the jury was retired when the predicate for the admission of the dying declarations was being laid, Held, when the jury were brought back to hear the testimony of the declarations, defendant should have objected to the proof until evidence as to the predicate was offered before the jury, otherwise he could not be heard to complain, unless the predicate as laid before the court presented an issue. It is only where the sufficiency of the predicate (in this case, whether deceased was conscious of approaching death) is in doubt that the court is required to submit the issue to the jury after they have heard the evidence as to the predicate.

**10. Same.**

See opinion for facts stated which are held sufficiently to establish a predicate for the admission in evidence of dying declarations; and where no issue as to the matter was necessary to be submitted to and determined by the jury.

**11. Dying Declarations.**

Where the dying declarations are proved to have been made under all the conditions guaranteed by the statute, a bare expression of declarant to a physician, who had told him that he would recover, "that he hoped for the best," would not affect the declarations made at some other time under a sense of impending death.

**12. Requested Instructions.**

Requested instructions upon issues not presented by the evidence are properly refused. And it is proper to refuse them when the law they submit has been given in the general charge.

ON MOTION FOR REHEARING.

**13. New Trial—Continuance.**

An application for continuance, when considered on motion for new trial, will be considered to have been properly overruled where, in the light of the evidence adduced, it can not be seen that the testimony of the absent witnesses would have been of any benefit to the defendant on the trial.

APPEAL from the District Court of Williamson. Tried below before Hon. R. E. BROOKS.

Appeal from a conviction of murder in the second degree; penalty, thirty-five years imprisonment in the penitentiary.

The appellant and Albert Highsmith were jointly charged by the in-

dictment with the murder of Thomas A. Evans, on the 22d of November, 1897, by shooting him with a pistol.

On a severance being granted, Albert Highsmith, who was the father of this appellant, had been tired first and acquitted.

The important facts attendant upon the homicide are stated in the two opinions below, and no additional statement is required.

*Makemson & Fisher, G. W. Jones,* and *Rob't A. John,* for appellant.

*W. W. Nelms* and *Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of thirty-five years, and he prosecutes this appeal.

The theory of the State, which was supported by evidence, was to the effect that bad blood had existed between the parties for some length of time; that on the Sunday of the homicide, about 12 o'clock, Thomas Evans, deceased, and the defendant were in the town of Hutto, both living about a mile east of the town on the same road. Deceased lived a short distance beyond defendant. Deceased left town on horseback some time between 12 and 1 o'clock proceeding towards his home. Appellant also started on horseback, going in the direction of his home, a short time afterwards. On the way, defendant, who was riding at a faster gait, passed deceased. He reached his home a short distance in advance of deceased. When deceased came up he accosted him and demanded to know what he had his knife up his sleeve for. Deceased made some reply to the effect that it was all right, and checked his horse up, but did not stop. Defendant then began to curse and abuse him, and drew his pistol on him, and deceased took his knife out of his sleeve, holding it in his hand, and a wordy altercation ensued. The father of the defendant came out from his house with a pistol and engaged in the altercation. Appellant demanded that deceased put his knife down, which he refused to do, and he then shot him, and inflicted a wound from which he died. The defendant's testimony up to the time of the altercation does not materially differ from the State's. Appellant's testimony, however, tended to show that there was a cessation or abandonment of the difficulty on his part after he first accosted deceased; and that deceased then attacked him with a knife, and was advancing upon him, when he shot and killed him.

Appellant reserved a bill of exceptions to the action of the court in overruling his motion to change the venue, but the same was not filed until ten days after the court had adjourned, and hence can not be considered. Concede, however, that we can consider the same we see no error in the action of the court.

Nor did the court commit any error in its action with reference to the special venire. The court's explanation shows that the summon-

ing of and requiring appellant to take said special venire was within the letter of the law.

Appellant filed a motion to continue the case on account of the absence of the following witnesses: C. S. Fielder, a resident of Val Verde County; Beau McCutcheon, a resident of Brewster County; Mrs. Lizzie Hosman, temporarily residing in Thurber, Palo Pinto County; and Arthur White, residing in Williamson County, but whose whereabouts were at the time unknown. As to the witnesses C. S. Fielder and Beau McCutcheon and Arthur White, they were not served with process, and the diligence does not appear to have been complete. Although defendant was arrested on the 6th of January, process was not issued for them until the 20th of January. The case was tried on the 8th of February. No excuse was shown for failure to have process issued earlier, and for aught that appears, by the issuance of process immediately on his arrest, these witnesses might have been procured. As to Mrs. Lizzie Hosman, it appears that she was served, but that on account of the sickness of her mother she was unable to attend. Appellant stated that he expected to prove by the witness Fielder the following facts: That a short time before the alleged homicide of Thomas A. Evans the witness, in a conversation with said Evans, heard him utter the following threats: "That if said John Highsmith did not leave this country, that he was a dead man, and that he intended to fix him the first opportunity he had." The threat was uttered in a menacing and angry tone, and was made with reference to a difficulty that had previously occurred between the son of deceased and appellant, which threat was communicated to defendant before the killing of said Evans. It will be noted, as to this threat, that no time is stated as to when it was made or when communicated. We know that the previous difficulty between the son of deceased and appellant, referred to, occurred about a year before the homicide. If the threat was made immediately after the first difficulty, deceased may have had numberless opportunities to execute the same, if he had been so minded. Living near each other, as they did, in the same community, deceased must have had a number of opportunities to execute the same, if it had been seriously made. If, on the contrary, it was made and communicated recently before the homicide, it may have had some significance. But we can not indulge presumptions to help out bills of exception in this respect. The threat was conditional to kill Highsmith if he did not leave the country. If Highsmith remained (as he did) in the country, and a number of opportunities were afforded for the execution of said threat, after its communication, it would bear no particular significance after such a lapse of time. The language of Beau McCutcheon is still more vague. It is alleged that he had had frequent conversations with deceased, and that he denounced defendant as a coward, and expressed anger and hatred towards him, and that he threatened him to said witness. When this occurred we are not informed, nor are we informed as to the nature of the threats. By the witness Lizzie

Hosman appellant says he expected to prove that some time before the alleged homicide she heard deceased, in speaking of defendant, John Highsmith, say that he was not satisfied with the result of the trouble that had occurred between defendant and his son Joe, and he proposed to see this thing settled; that he used this language in an angry and threatening manner. This is subject to the same criticisms we have made as to the witness McCutcheon's testimony; that is, entirely too general, too vague, and no time was fixed. The testimony of the witness Arthur White is more explicit. As to him it was stated it was expected to be proved that deceased met him on the morning preceding the homicide, and in his presence stated "that there was going to be hell raised with the Highsmiths" (meaning defendant and his father); that he expected to clean out the Highsmiths. In regard to the testimony of this witness, and, indeed, with reference to all threats in that connection, from our view of the record, it does not occur to us that any of the threats were material under the circumstances of the homicide. According to the testimony of all the witnesses, both for the State and the defendant, appellant was the aggressor, and brought on the difficulty. Concede that deceased had his knife, which was a large one, open, and up his sleeve, when defendant passed him on the way to his home, there was no attempt on his part to bring on the difficulty, or use said knife; and, for aught that appears, he had it open merely for his own protection, pursuing his journey to his home. Certainly, if his purpose was to make an attack on defendant with said knife, when he first passed him there was presented a much more favorable opportunity than subsequently occurred when he had passed the home of defendant. According to the testimony, he made no hostile act or demonstration here until he was accosted by the defendant, who demanded to know what he was doing with the knife up his sleeve. So far as the record advises us, he would have passed the house of defendant without so much as having an altercation with him; and it was no offense for him to have his knife open and up his sleeve in pursuing his route home. So far threats served no purpose to qualify or aggravate any act of deceased, because up to this time he was guilty of no hostile demonstration against appellant. But it is said that after the beginning of the difficulty appellant abandoned the same, and that then deceased attacked him with his knife; and that he raised his knife in a threatening attitude, and advanced on defendant, who at the time had a pistol. If he had the knife as described it was evidently a deadly weapon; and, if he was advancing on appellant at the time, the fact that he may have previously threatened to take his life, it does not occur to us, would lend any additional significance to his attitude and acts at that time. If he was making an assault at all on deceased, it was apparently a deadly assault. We are merely conceding here, for the purpose of the argument that there was an abandonment by appellant of the difficulty; but we do not believe the facts bear out this contention. To our minds, the record shows a continuation of the

difficulty from start to finish. There was a slight cessation, it is true, when the father of appellant rushed out with a sixshooter, and, according to the testimony of some of the witnesses, called to his son not to shoot; but this was merely temporary. Events followed each other in rapid succession up to the final catastrophe. It will be further noted that none of the threats, except Fielder's were claimed to have been communicated to defendant prior to the homicide. So none of these uncommunicated threats could have exercised any influence on the mind of the appellant, or caused him any additional apprehension, other than was afforded by the attitude and acts of deceased at the time. Accordingly, what it is claimed was said by deceased to Arthur White, could not have influenced him in the least, and, as shown above, such threats would serve but little purpose to intensify an act which, from appellant's standpoint, could bear no other significance than a deadly assault, and did not need the reinforcement of threats.

Appellant excepted to the action of the court in excluding the testimony of F. A. Cheatam to the effect that shortly before the homicide he had a conversation with the deceased, in which he said that sometimes he felt like taking a gun and killing two or three people; that, as he said this, the conversation was interrupted by some one coming up, and a week or two afterwards he met defendant again, and he immediately began talking about defendant's difficulty with the son of deceased, and stated the costs which he was forced to pay were greater than all his doctors' bills, and spoke of the healthy condition of his family. As to the first part of the conversation, it is not shown to have had any reference to appellant. As to the second conversation, no language is shown to have been used by deceased, except he stated the costs which he was forced to pay on account of the difficulty with defendant's son were greater than all his doctors' bills. We can not conceive how this was material.

Appellant, on the subject of dying declarations, reserved the following bill of exceptions: "Be it remembered that on the trial the State was permitted to introduce the evidence of Mrs. A. J. McCutcheon and A. M. Smith as to the dying declarations of the deceased, Thos. A. Evans, upon the predicate as set out in the statement of facts herein, whereupon defendant then and there in open court excepted, because —first, the same was hearsay, and is the testimony introduced of a witness not in court, and the defendant had not the privilege of being confronted by same for cross-examination; second, because the predicate shows that the deceased was not conscious of approaching death, or that death was impending, as required by the statutes." The shape in which this bill is presented, in order to be considered by us, requires an investigation of the entire record as contained in the statement of facts to ascertain the predicate laid, as well as the dying declarations. It occurs to us that the bill should have contained the predicate, as well as the dying declarations. Concede, however, that we must look to the statement of facts in order to ascertain the predicate as laid, as well

as the dying declarations, we can not agree to the insistence of appellant. The statement of facts shows that when the predicate was being laid, at the request of appellant, the jury were retired, and the witnesses were examined in the presence of the defendant before the court. It seems to us that, when the jury were brought back to hear the testimony of the dying declarations, appellant, before he should be heard to complain, should then have objected to the proof of the dying declarations until evidence was offered before the jury of the predicate. If, however, by his course, he did not waive this, he certainly could not be heard to complain, unless the predicate, as laid before the court, presented an issue; that is, if the predicate was sufficiently laid in the opinion of the court, and there was no controversy as to the dying declarations being made under the conditions required by statute, then all that was necessary for the jury to hear was the declaration itself, for that was all that they were concerned about. If, however, the testimony showed, as is claimed in this case, that deceased, when he made the statement, was not conscious of approaching death, or if, on the other hand, he then entertained any hope of life, it would have been the duty of the court to have submitted said issue to the jury; and, in order that they might properly judge thereof, it was necessary that they should have heard the testimony on that subject. We have examined the record carefully in regard to said predicate, and, in our opinion, it presents no issue suggesting that appellant at the time entertained any hope of life. From the time he was shot until his death he seemed to be conscious that he was going to die. He told appellant at the scene of the homicide that he had killed him already, and to let him go, so that he could die at home. He told Mrs. McCutcheon and Smith repeatedly that he was going to die, and that he had no hope of recovery. True, according to Dr. Eanes, he asked him if there was any hope of recovery, but the doctor gave him no hope. Dr. Percy says that he told him that it was the opinion of Dr. Flynn and himself that he was not shot through, but the ball had ranged around, and that he would recover, and in reply to this deceased said "he hoped for the best." But he says that this conversation occurred after the first statement Evans had made to the witness Mrs. McCutcheon; so that, if it could be held to have any effect against the overwhelming weight of the testimony, it could not affect the first statement Evans had made to the witness Mrs. McCutcheon. That statement, according to her testimony, was made under the solemnity of conscious approaching death; and the second statement was but a repetition of it. We would further remark that, whatever may have been said by deceased to Dr. Percy, no connection is shown between it, as to time and place, and the statements made to Mrs. McCutcheon or to Smith. Their testimony shows beyond all cavil or controversy that the declarations were made under all the conditions guaranteed by the statute on the subject of dying declarations; and the bare expression of deceased to Percy, "that he hoped for the best," even if it can be construed to mean that he

then entertained some hope of recovery, would not affect declarations made at some other time under a sense of impending death. In our opinion, there was no issue on this subject to go to the jury, and it was not necessary that the predicate which was laid before the judge alone should have been reintroduced before the jury.

Appellant excepted to the refusal of the court to give his first special instructions on self-defense, in connection with threats on the subject of appellant's right to arm himself with a pistol to defend himself against any unlawful attack which he apprehended on the part of deceased. There was nothing in this case authorizing such an instruction. The court gave a full charge on the subject of self-defense, covering every phase of the case. He also, in this connection, gave a charge on threats, which, as we have before discussed, was not, in our opinion, rendered necessary by the facts in this case. Appellant requested a special instruction on the subject of provoking the difficulty, and reasonable doubt in that connection; but the same was fully given by the court in its charge. Nor was the special requested instruction on the subject of abandonment of the difficulty by defendant required, as the jury was duly instructed on that subject in the main charge of the court. As to manslaughter, we do not believe it was in this case. The court, however, gave a full charge on this subject. We have examined the charge of the court carefully, and, in our opinion, it is an admirable exposition of the law, especially that portion of it on provoking a difficulty, and, in that connection the abandonment thereof by appellant, and his rights thereafter. Said charge is carefully guarded, and every right of appellant adequately and liberally protected. As stated, however, we fail to see from the record in this case any abandonment of the difficulty on the part of appellant from the time he brought it on, and there was no necessity, in our judgment, for the court to have given this charge. Still appellant can not complain that such a charge was given. Nor do we see any error in the action of the court with reference to the juror Hugh Emerson. The matter was presented to the court on the facts, and under the evidence the court very properly held him a fair and impartial juror. There being no error in the record, the judgment is affirmed.

*Affirmed.*

### ON MOTION FOR REHEARING.

HENDERSON, JUDGE.—This case was affirmed at a former day of this term, and now comes before us on motion for rehearing.

Appellant's principal contention is to the effect that this court erred in holding that the court below did not err in overruling appellant's motion for continuance, and in refusing to grant appellant a new trial for the error committed in overruling his motion for continuance. We discussed this matter at length in the original opinion, and we there held that appellant was lacking in diligence in suing out process for the

absent witnesses, C. S. Fielder, Arthur White, and Mrs. Lizzie Hosman; that the testimony of said witnesses, even if they had been present, in our view of the case, was immaterial, inasmuch as the record shows without controversy that appellant was the aggressor in the difficulty. Appellant, however, insists that, though he may not have used diligence in procuring said witnesses, yet it appearing, after the conviction, that the testimony of said witnesses would have been material and probably true, another rule prevails, and that a new trial will then be granted in the interest of justice, although appellant may have been lacking in diligence; and furthermore, he insists that the testimony of both the communicated threats of Fielder and the uncommunicated threats of White and Mrs. Hosman would be material, both as tending to show who was likely the aggressor and brought on the difficulty, and as tending to render more significant the actions of deceased on that occasion, from the defendant's standpoint. Appellant, in this connection, further urges that the court committed a very serious error in stating that the former difficulty between deceased's son Joe Evans and appellant occurred about a year before the homicide, whereas, in truth and in fact, it occurred, as appears from the record, only three months prior to the homicide; and also that the court was not authorized in stating that, after the time when said threats should have been communicated, deceased and appellant must have met a number of times, as they lived in the same neighborhood, etc.; and that we were further in error in stating that bad blood existed between the parties, deceased and defendant, it being insisted that the record does not disclose any animosity on the part of defendant towards deceased, however much it may indicate animosity towards defendant on the part of deceased.

We concede that we were in error in stating that the former difficulty between appellant and deceased's son Joe occurred about a year before the homicide. The record is somewhat confused on this subject, and we were thereby misled. On a closer inspection, it is apparent that the difficulty occurred between deceased's son Joe and defendant on August 21, 1897, just three months before the homicide. Of course, the time being shorter than stated in the original opinion, there would be less opportunity for the parties to have met between the time of the difficulty, in August, and the homicide, in November. Still, the parties lived close neighbors. Deceased, in going to town, traveling immediately by appellant's house, in the very nature of things there were frequent opportunities of meeting. Besides, as to the witness Fielder, by whom alone it was alleged communicated threats could be proved, it is not stated when said threats were made, save that they were made after the difficulty between appellant and deceased's son. How long after we are not informed. It is stated that they were communicated before the homicide, but how long before we are not told. The rule is that presumptions will not be indulged in to help out the failure of appellant to definitely state these matters. In the view we take of this question, we do not consider that it makes any material difference

.that the threats were communicated a year or only three months before the homicide. In either event, as stated in the original opinion, the parties, being near neighbors, must have met; and if appellant enter-tained any apprehension of danger from deceased on account of said threats, ample opportunity was afforded to have him arrested and put under a peace bond.

In regard to the existence of bad blood between the parties, and that this feeling was shared in by defendant, we think the record through-out discloses this. We will only cull from the testimony enough to show the animus of appellant's mind towards deceased, and that it had existed for some time. The fight between Joe Evans (son of deceased) and defendant, in which the former got the worst of it, occurred about three months before˙ the homicide. It was shown that threats by de-ceased against defendant were shortly afterwards communicated to him. George McCutcheon stated that he knew the bad feeling that had existed between Evans and Highsmith for some time. Deceased had been picking at John (defendant) ever since he was a little boy. This same witness testified that, during the difficulty, defendant, with his pistol drawn and presented at defendant, who had a knife in his hand, said, "God damn you, drop it! You have been making your John Branch plays with that knife before." The evidence of this same witness shows that deceased bought the knife in question some time before, and, in connection with said knife, had made some threat against defendant to this same witness, who told him that "that knife would get him into trouble yet." This, it appears, was communicated · to defendant. From this testimony and other evidence in the record, we do not think it can be seriously contended that appellant did not entertain animosity towards deceased antedating the homicide for some months.

Now, as to the motion for continuance, there can be no question that appellant was utterly lacking in diligence. He claims that Fielder was a material witness, and yet this record shows that he knew where Fielder lived; that his residence was near Langtry, in Val Verde County; but, notwithstanding this, he states, as a reason for his failure to issue process for said witness until the 24th of January (which was fourteen days after his˙ arrest), that he was seeking to ascertain his whereabouts, and did not learn of this until the 23d of January, 1898. This, as stated, was an utter lack of diligence on his part to procure what he alleges to be very material testimony. The threats expected to be proven by the other absent witnesses it is not claimed were com-municated. Concede, however, that the question of diligence cuts no figure when the matter comes up on motion for new trial, we still ad-here to our original opinion, that an impartial review of the testimony of the eyewitnesses fails to disclose the materiality of the testimony of the absent witness. George McCutcheon, who was the only eyewitness who saw and testified in regard to the entire difficulty from start to finish, although used by the State, was evidently not an unfriendly

witness to defendant. The other witnesses who saw the difficulty after it had begun and its termination were Albert Highsmith, father of appellant, Mr. and Mrs. Will Highsmith, Mattie Brown, and Susie Magruder. None of the defendant's witnesses antagonize the State's witness George McCutcheon as to the beginning of the difficulty, and, of course, as to the inception of the conflict, the case must rest on his testimony. True, several of appellant's witnesses, who state they were sitting on the gallery of Albert Highsmith's house, about seventy-five yards from the place of the difficulty, state they saw deceased Evans, when he rode up to where defendant was. Will Highsmith says Evans rode along, and wheeled his horse right in behind the defendant, when the difficulty began. Albert Highsmith testified on this point: "I noticed Evans for the first time when he was within twenty steps of defendant. He rode right up until he got right on the boy, turning his horse near him as he approached. The defendant's horse was facing south across the road, and just as Evans' horse got behind the boy's, going east, he wheeled his horse around, and as he did so, I saw him make an attempt as if he was going to cut him." Now, it will be noticed that not one of these witnesses states he was immediately present, and does not assume to state what occurred before this, except the witness George McCutcheon. This witness states that he saw defendant pass deceased just before they got across the culvert, coming in his direction. This culvert was some 200 yards from the witness, down the road in the direction of Hutto. "I did not notice anything when he passed him. When John got to the gate, I was in about four steps of the gate. John said to me, 'What makes you walk and look so sleepy?' Defendant and I were standing talking, and Mr. Evans was then about twenty or thirty steps off, coming towards us, traveling in an ordinary gait for a walking horse. As Evans came up, I spoke to him, first saying, 'Howdy, Tom;' and he said, 'Howdy, George.' When Evans was within a few feet of us, defendant turned his head towards deceased, and said to him, 'What is that you have got up your sleeve?' The deceased replied, 'That is all right;' and continued riding on. When deceased's horse's head reached a point nearly opposite the tail of defendant's horse, the defendant again asked, 'What is that you have got up your sleeve?' Evans again replied, 'That is all right;' and sorter checked up his horse, but did not stop. Defendant then said, 'You God damned hypocritical son of a bitch, it's a knife you have, and you have it for me.' Deceased then stopped his horse, and turned facing south, in the same direction defendant's horse was facing, and, shaking the knife out of his sleeve, said, 'Well durn you, if nothing else will do you, it is a knife, and I've got it for you.' As deceased stopped his horse and turned, defendant turned his horse around, pulling him back, and facing his horse to deceased, and pulled his pistol, and cocking it, threw it down on deceased, and continued cursing him. Deceased was at this time facing defendant with his knife in his right hand, with the blade pointing towards defendant, and was gritting his

teeth at defendant. Deceased then caught hold of the lapels of his coat in each hand, and, holding his coat open, said, 'If you want to murder me, just shoot.' At this time defendant and deceased were about two horse lengths apart, defendant having pulled his horse around and back several feet towards Hutto, but still keeping his pistol leveled on deceased. About this time Albert Highsmith, defendant's father, came running out from the house, and calling to defendant to not shoot. When he got out near the road, he pulled his pistol, and leveling it at deceased, said, 'You want to murder my boy.' Deceased replied, 'No; you want to murder me.' When Albert Highsmith got to the road, deceased turned from defendant, and rode across to near where Albert Highsmith was standing, facing Albert Highsmith, with his back turned towards defendant. Albert Highsmith told deceased to drop his knife. Deceased answered, 'I will die first.' Deceased then turned his horse again towards defendant, and with his knife still in his right hand, with the blade pointed outward towards defendant, and his arm extended, defendant then said, 'God damn you, drop it! You have been making your John Branch plays with that knife before.' Evans said, 'I will die first, if you want to murder me, just shoot.' Evans was then standing up in his stirrups, pointing his knife towards defendant and gritting his teeth. (Witness here illustrated how Evans was motioning with his arm and knife.) John then shot him. When the shot was fired, deceased was about six or seven feet from defendant. I did testify at the examining trial that it was about fourteen feet, but have since learned that it was about six or seven feet. When deceased was shot, he settled back in his saddle, and said, 'You have killed me; let me go home and die.' The defendant said nothing, but, as deceased turned and rode away, he said something about his friends who would see him through this. Albert Highsmith said, 'If you want any more, just come back again.' When the shot was fired, deceased was nearer to Albert Highsmith than to defendant. Both defendant and Albert Highsmith had their pistols leveled on him." We have given substantially his testimony in chief, and the cross-examination did not materially change this.

As stated before, no one but the witness George McCutcheon was immediately at the place of the difficulty, and heard and saw what the parties said and did. We do not understand that there is any clash as to the origin of the difficulty between the evidence of McCutcheon and the evidence of defendant's witnesses. They heard nothing, and they saw nothing, until deceased stopped and turned towards defendant, and we think a fair review of George McCutcheon's evidence establishes without controversy that appellant began the difficulty. It is strenuously urged by appellant that it appears from the testimony that deceased, as he approached defendant, who had stopped in the road to talk to George McCutcheon, was riding directly onto defendant, as if he were menacing him; but we submit that his testimony, fairly considered, does not bear out this contention. It is true McCutcheon's

testimony shows that deceased was riding towards defendant, and he may have been on the same side of the lane, yet he was not coming as if to attack him or to ride him down. He was in the act of passing appellant, who called to him, not once, but thrice. When deceased was nearly opposite defendant, riding in an oridnary walk, defendant turned his head towards deceased, and said to him, "What is that you have got up your sleeve?" Deceased merely replied, "That is all right," and continued right along. Again, when deceased's horse's head reached a point nearly opposite the tail of defendant's horse, defendant asked, "What is that you have got up your sleeve?" Evans replied, "That is all right;" and "sorter checked up his horse, but did not stop." Defendant still persisted, and denounced him as a "God damned hypocritical son of a bitch," and told him that it was a knife he had up his sleeve, and that it was for him. If this was not language calculated to provoke a difficulty, then we are unable to understand the use of plain, emphatic, abusive language.

It will be observed, in this connection, that Evans had just previously passed defendant en route from Hutto to his home, and, if he had desired to attack him, there was certainly then a better opportunity than afterwards, when defendant had reached his home, and was surrounded by his family and friends. He made no effort at this time, and the evidence shows that when defendant passed him he then had his knife up his sleeve, and defendant must have observed it. He was passing him the second time. But appellant, not content to allow him to pass along in peace, challenged him in regard to his purpose in carrying a knife up his sleeve; not content with his reply that it was all right, proceeded to denounce him in bitter and vindictive and abusive language, eminently calculated to provoke and bring on a difficulty. As stated, the origin of this difficulty must rest or fall on the testimony of George McCutcheon, because no witness contradicts him, and, measured by his testimony, we fail to see what purpose threats, however malignant or diabolical, would have served. It occurs to us that, under such circumstances, threats, instead of being an advantage, would have been a circumstance of aggravation, as showing animus. If threats, under such circumstances, will afford a justification or mitigation of the offense, as was said in Johnson v. State, 27 Texas, 758, "a full floodgate would be given to the most wicked passion, and murder, fearful as it already is, in a tenfold greater degree would stalk through the land clothed in the panoply of the law."

If we take up the other witnesses after they come upon the scene, we fail to find, from a fair review of their testimony, that there was at any time an abandonment of the difficulty. The most that can be said is that there was a temporary cessation as Albert Highsmith came out of his house with his pistol. Nor does the testimony of any of the other witnesses suggest to our minds that at any time

appellant's right of self-defense, as claimed by him, was restored, on account of any acts or conduct on his part. Both appellant and Albert Highsmith were armed with pistols. Deceased's only weapon was a knife. According to the testimony of Albert and Will Highsmith, when Albert Highsmith came out into the road with his pistol, deceased, from some account, turned from defendant, and confronted Albert Highsmith. He says that he was going to his boy, but deceased turned his horse, and cut him off, and then drew his knife on him in a striking position; that he then drew his pistol, and said, "You want to murder my boy." Deceased replied, "You want to murder me." Both defendant and Albert Highsmith, it seems, about this juncture, demanded that he drop his knife, and he replied that he would die first. From some cause deceased turned towards defendant, according to their testimony, and advanced on him, when he shot him. At no time, does it occur to us, was there a stoppage or interruption of the difficulty. Events followed each other in rapid succession, and evidently a very short space of time ensued between the beginning and the end of the difficulty. Appellant, having provoked the difficulty, followed it up. Reinforced by his father, both armed with pistols, they had a vast advantage over deceased; and, under the circumstances exhibited in this record, they had no right to disarm him, much less to slay him because he refused to be disarmed.

The animus of defendant is further manifest by his declarations made immediately after the homicide. As testified by Susie Magruder and Mattie Brown (two little visiting girls at the house of Albert Highsmith), defendant said, as he came in: " 'God damn him, I wish I had killed him. God damn him, I believe I will go and kill him yet.' Then said to us: 'Little girls, you need not be afraid. All of this is caused by little girls' talk.' " In our view of the case, it makes no diffcrence that deceased when he was shot was advancing on defendant with a drawn knife. His adversary had begun the difficulty. Reinforced by his father, and armed with superior weapons, they had followed it up. If deceased did advance upon defendant, menaced and beset as he was, he had a right to act in self-defense; and we fail to see how the threats proposed to be proved by the absent witnesses, whether communicated or uncommunicated, would in anywise, either at the beginning or during the entire progress of the difficulty, have benefited appellant. According to the original opinion, what deceased did after he was attacked was proved by positive testimony. His conduct was manifest, and it did not require threats to give it additional significance. Nor, as before stated, was it a question as to who began the difficulty. There was no controversy as to this matter. In whatever light the question may be viewed, we fail to see what benefit the testimony of the absent witnesses would have served in this case.

We understand appellant also complains of some of the charge

the court, and that the court should have given some of the charges requested by him. This matter was discussed in the original opinion, and we do not deem it necessary here to reiterate what was then said. The motion for rehearing is overruled.

*Motion overruled.*